Phil **BARSHOP, Ralph Zendejas, Mike Beldon, Rosa Maria Gonzalez, John Sanders, Sylvia Ruiz Mendelsohn, Joe Bernal, Rogelio Munoz, Mack Martinez, Jane Hughson, Doug Miller, Paula Di-Fonzo, and The State of Texas, Appellants,**

v.

**MEDINA COUNTY UNDERGROUND WATER CONSERVATION DIS-TRICT, et al., Appellees.**

No. 95–0881.

Supreme Court of Texas.

Argued March 20, 1996.

Decided June 28, 1996.

Rehearing Overruled Aug. 16, 1996.

620

Barry A. Chasnoff, Stephan B. Rogers, Eulogio Garza, San Antonio, Elbert Hooper, Joe R. Greenhill, Corwin W. Johnson, Austin, Mary Q. Kelly, L. Eric Friedland, Charles C. Bailey, Russell S. Johnson, Richard L. Crozier, San Antonio, Dan Morales, Brian E. Berwick, Austin, Polly Jessica Estes, San Antonio, for Appellants.

W. Scott McCullough, E. Small, Gary L. Bledsoe, Austin, Louis T. Rosenberg, San Antonio, Dan Morales, Javier Aguilar, Harry G. Potter, Brain E. Berwick, Austin, Pedro G. Nieto, Uvalde, Richard Wesley Russell, Castroville, Jennifer S. Riggs, Austin, for Appellees.

Justice ABBOTT delivered the opinion for a unanimous Court.

This case concerns water rights in Texas. The clash between the property rights of landowners in the water beneath their land and the right of the State to regulate water for the benefit of all is more than a century old. This case presents another chapter in this ongoing battle.

Historically, landowners have had property rights in the water beneath their land. Over time, however, the State has increasingly attempted to regulate water usage and its withdrawal from the ground. Indeed, the State has the responsibility under the Texas Constitution to preserve and conserve water resources for the benefit of all Texans. Article 16, section 59 of the Texas Constitution provides:

> The conservation and development of all of the natural resources of this State, . . . and the preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.

TEX. CONST. art. XVI, § 59(a). Pursuant to this constitutional authority, the Legislature enacted the Edwards Aquifer Act and created the Edwards Aquifer Authority. Plain-tiffs claim that the Act violates their right to withdraw water from their property.

The Plaintiffs in this case consist of the Medina County Underground Water Conservation District, the Uvalde County Underground Water Conservation District, the Texas and Southwestern Cattle Raisers Association, Russell Brothers Cattle Company, and Bruce Gilleland (collectively referred to as "Plaintiffs"). They filed suit against the individual directors of the Edwards Aquifer Authority, the State of Texas, and the City of San Antonio (collectively referred to as "the State"). Plaintiffs claim that various provisions of the Edwards Aquifer Act violate the Texas Constitution. The district court agreed with Plaintiffs and enjoined the Act's implementation. The State then perfected a direct appeal to this Court under section 22.001 of the Government Code.

This appeal centers on whether the Act is constitutional on its face, not whether it is unconstitutional when applied to a particular landowner. Under a facial challenge, Plaintiffs must establish that the statute, by its terms, always operates unconstitutionally. We conclude that Plaintiffs have not sustained that burden. Accordingly, we reverse the judgment of the trial court and render judgment that the Act is not facially unconstitutional.

I

The Edwards Aquifer is a unique underground system of water-bearing formations in Central Texas. Water enters the aquifer through the ground as surface water and rainfall and leaves the aquifer through well withdrawals and springflow.

The aquifer is the primary source of water for residents of the south central part of this state. It is vital to the general economy and welfare of the State of Texas. *See* Act of May 30, 1993, 73d Leg., R.S., ch. 626, § 1.06, 1993 Tex. Gen. Laws 2355, *as amended by* Act of May 29, 1995, 74th Leg., R.S., ch. 261, 1995 Tex. Sess. Law Serv. 2505. Because of anticipated increases in the withdrawal of water from the aquifer and the potentially devastating effects of a drought, the Legislature determined it was "necessary, appropriate, and a benefit to the welfare of this state

to provide for the management of the aquifer." *Id.* The Legislature thus enacted the Edwards Aquifer Act in 1993 to manage the aquifer and to sustain the diverse economic and social interests dependent on the aquifer water. *Id.* § 1.01.

The Act establishes a conservation and reclamation district named the Edwards Aquifer Authority to regulate groundwater withdrawals by well from the aquifer. *Id.* §§ 1.02, 1.14. The Authority's jurisdiction includes all or parts of Atascosa, Bexar, Caldwell, Comal, Guadalupe, Hays, Medina, and Uvalde counties. *Id.* § 1.02. The Authority supersedes the Edwards Underground Water District, which previously possessed limited power to govern the aquifer. *Id.* § 1.41.

The Act imposes an aquifer-wide cap on water withdrawals by non-exempt wells of 450,000 acre-feet of water per year through the year 2007 and 400,000 acre-feet per year thereafter.[1] *Id.* § 1.14(b) & (c). The Authority can increase the withdrawal caps if it determines that additional water supplies are safely available from the aquifer. *Id.* § 1.14(d). The Authority will allocate these caps among wells by a permit system. However, all wells producing no more than 25,000 gallons of water a day for domestic or livestock purposes are exempt from the permit system and the caps. *Id.* §§ 1.16(c), 1.33. This exemption allows all landowners, except those within or serving a platted subdivision, to drill wells for household purposes, watering animals, or irrigating a family garden. *Id.* §§ 1.03(9), 1.33.

The permit system established by the Act gives preference to "existing users." The Act defines "existing users" as those persons who withdrew and beneficially used underground water from the aquifer on or before June 1, 1993. *Id.* § 1.03(10). The Authority will grant regular permits only to existing users who properly file a declaration of historical use and who can establish, by convincing evidence, beneficial use of the water withdrawn between June 1, 1972 and May 31, 1993. *Id.* § 1.16. The Act requires existing users to file this declaration of historical use on or before March 1, 1994. *Id.* Until regular permits are granted, existing users can withdraw and beneficially use water, provided it is not wasted. *Id.* § 1.17.

The Act entitles an existing user to a permit for an amount of water equal to the user's maximum beneficial use of water during any one calendar year of the historical period, unless the sum-total amount of such use throughout the aquifer exceeds 450,000 acre-feet. *Id.* § 1.16. If this occurs, the Authority is required to adjust proportionately the amount of water authorized for withdrawal under the permits to meet the cap.[2] *Id.*

To the extent that water is available for permitting after the issuance of permits to existing users, the Authority may issue additional regular permits, subject to the 450,000 acre-feet cap. *Id.* § 1.18. Under this provision, landowners (other than those in platted subdivisions) who cannot establish beneficial use of aquifer water prior to June 1, 1993 will not be entitled to a water withdrawal permit unless the aggregate of all existing user permits is less than 450,000 acre-feet. Such landowners would nevertheless be able to withdraw up to 25,000 gallons of water a day under the domestic and livestock use exemption.

Under certain circumstances, the Authority may also issue interruptible permits allowing some landowners to withdraw water only when the level of the aquifer is at specified depths. *Id.* § 1.19. Furthermore, the Authority possesses the power to issue emergency permits to prevent the loss of life or to

---

1. An acre-foot is the amount of water that would cover an acre of land to one foot, approximately 325,850 gallons. The aquifer-wide cap of 450,-000 acre-feet converts to approximately 147 billion gallons of water.

2. An existing user can avoid this downward adjustment under two circumstances. First, an existing user who has operated a well for three or more years during the historical period shall receive a permit for at least the average amount of water withdrawn annually during the historical period. *Id.* § 1.16. Second, an existing irrigation user shall receive a permit for not less than two acre-feet a year (approximately 650,000 gallons) for each acre of land the user actually irrigated in any one calendar year during the historical period. *Id.*

prevent severe, imminent threats to the public health or safety. *Id.* § 1.20.

The Act was originally passed on May 30, 1993, and was to take effect September 1, 1993. However, it did not become effective then because the United States Department of Justice refused to give administrative preclearance to the Act under section 5 of the Voting Rights Act due to the appointment method of selecting the board of directors for the Authority. In response, the Legislature amended the Act in May 1995, changing the board's selection method from appointive to elective. *See* Act of May 29, 1995, 74th Leg., R.S., ch. 261, 1995 Tex. Sess. Law Serv. 2505. In August 1995, the Department of Justice precleared the amended Act.

The amended Act was to be effective August 28, 1995. *Id.* However, six days before the effective date, Plaintiffs brought this lawsuit to restrain the administration and enforcement of the Act. The district court held the Act unconstitutional and enjoined the State from enforcing the Act.

■ The district court made 361 findings of fact, including sweeping findings concerning each aspect of the Act it held unconstitutional. These findings of fact, however, have a limited role in our constitutional review of this Act. *Texas Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex. 1995). If the Act is constitutional under any possible state of facts, we should presume that such facts exist without making a separate investigation of the facts or attempting to decide whether the Legislature has reached a correct conclusion with respect to the facts. *Id.*; *see also Corsicana Cotton Mills v. Sheppard*, 123 Tex. 352, 71 S.W.2d 247, 250 (1934). Thus, in our review of this Act, we focus on the entire record presented to us rather than simply relying upon the fact findings of the district court.

Because of the district court's injunction, this Act, which was originally to be effective September 1, 1993, has yet to be implemented. The State brought this direct appeal to this Court seeking authorization to implement the Act.

II

Governmental regulation of Edwards Aquifer water is nothing new. For years, disparate authorities, including the Medina County Underground Water Conservation District, the Uvalde County Underground Water Conservation District, and the Edwards Underground Water District, have used a variety of laws such as the Texas Water Code to regulate the use of the aquifer water.

Plaintiffs claim, however, that the Act and the new Authority are distinctly different from prior regulations. Plaintiffs assert that the Act does more than just regulate use of the aquifer water; it actually deprives the landowner of a vested property right. Plaintiffs concede that the State has the right to regulate the use of underground water, *see Friendswood Dev. Co. v. Smith–Southwest Indus.*, 576 S.W.2d 21, 29–30 (Tex.1978); *Beckendorff v. Harris–Galveston Coastal Subsidence Dist.*, 558 S.W.2d 75 (Tex.Civ. App.—Houston [14th Dist.] 1977), *writ ref'd n.r.e.*, 563 S.W.2d 239 (Tex.1978), but maintain that they own the water beneath their land and that they have a vested property right in this water. The State insists that, until the water is actually reduced to possession, the right is not vested and no taking occurs. Thus, the State argues that no constitutional taking occurs under the statute for landowners who have not previously captured water, while Plaintiffs argue that these landowners have had a constitutional deprivation of property rights. The parties simply fundamentally disagree on the nature of the property rights affected by this Act.

Plaintiffs' argument relies on our line of cases which adopted the rule of capture for underground water. *See, e.g., Houston & T.C. Ry. Co. v. East*, 98 Tex. 146, 81 S.W. 279 (1904). *East* presented a claim by a landowner with a shallow well on his homestead that dried up when a railroad dug a deep well on its adjacent property. The landowner's claim for damages was rejected by this Court. In doing so, we adopted the common law rule that the right to withdraw underground percolating water is not correlative, but is "absolute." *Id.* 81 S.W. at 280–81. Under this rationale, underground water in

Texas has not been subject to the "reasonable use" rule adopted by some other American jurisdictions.

We followed the rationale of the *East* rule in *City of Corpus Christi v. City of Pleasanton,* 154 Tex. 289, 276 S.W.2d 798, 801 (1955). We noted that the only limitations on the common-law absolute ownership rule were that the owner could neither maliciously take water for the sole purpose of injuring his neighbor nor wantonly and willfully waste water. *Id.* The *East* rule has since been modified to recognize that a landowner can be liable for negligent withdrawal of water that proximately causes subsidence damage to the land of others. *See Friendswood,* 576 S.W.2d at 30.

The State concedes that Plaintiffs have significant rights to the water under their land. In the Act, the Legislature specifically recognized the ownership and rights of the landowner in the underground water and that action taken pursuant to the Act may not be construed as depriving or divesting the owner of these ownership rights. *See* Act of May 30, 1993, *supra,* § 1.07.

At the same time, however, the State relies on our opinions which have long recognized the necessity of legislation that conserves and preserves our limited water resources. *See, e.g., City of Corpus Christi,* 276 S.W.2d at 803; *Friendswood,* 576 S.W.2d at 30. Conservation of water has always been a paramount concern in Texas, especially in times, like today, of devastating drought. The past droughts of 1910 and 1917 prompted the citizens of this state to approve the Conservation Amendment to the Texas Constitution, which provides that the conservation, preservation, and development of the state's natural resources are public rights and duties. *See In re the Adjudication of the Water Rights of the Upper Guadalupe,* 642 S.W.2d 438, 440 (Tex.1982). Between 1950 and 1957, Texas sustained a record period of drought which almost dried up the aquifer springs. *See id.* at 441. The prospect of future droughts always lingers in the face of ever-increasing demands for water from the aquifer.

While our prior decisions recognize both the property ownership rights of landowners in underground water and the need for legislative regulation of water, we have not previously considered the point at which water regulation unconstitutionally invades the property rights of landowners. The issue of when a particular regulation becomes an invasion of property rights in underground water is complex and multi-faceted. The problem is further complicated in this case because Plaintiffs have brought this challenge to the Act before the Authority has even had an opportunity to begin regulating the aquifer.

Despite these problems and competing interests, this case involves only a facial challenge to the Act. Because Plaintiffs have not established that the Act is unconstitutional on its face, it is not necessary to the disposition of this case to definitively resolve the clash between property rights in water and regulation of water. Instead, our focus will be on the issues which control the resolution of this case.

### III

■ The initial issue to decide is whether Plaintiffs have standing to bring this lawsuit. Standing is a necessary component of subject matter jurisdiction. A two-part test governs whether a plaintiff has standing to challenge a statute. First, the plaintiff must suffer some actual or threatened injury under the statute. Second, the plaintiff must contend that the statute unconstitutionally restricts the plaintiff's own rights. *Garcia,* 893 S.W.2d at 518.

Asserting that Plaintiffs cannot establish an actual or threatened injury, the State maintains that Plaintiffs are merely speculating that they will be deprived of property rights under the Act. The State argues that Plaintiffs must actually be deprived of their property before they can maintain a challenge to this statute. This argument, however, misconstrues the nature of the Plaintiffs' challenge to the Act.

■ Plaintiffs do not——and cannot—— assert that the Act is unconstitutional "as applied" because the Act has never been applied to anyone. Instead, Plaintiffs claim only that the Act is unconstitutional on its

face. To sustain a facial challenge, the challenging party must establish that the statute, by its terms, always operates unconstitutionally. *Garcia*, 893 S.W.2d at 518. Thus, through this challenge, Plaintiffs are arguing that the Act will, under all circumstances, deprive them of their property rights in underground water. We therefore conclude that Plaintiffs have properly alleged an actual or threatened injury under the Act.

■ The next aspect of the standing inquiry is whether the Plaintiffs contend that the statute unconstitutionally restricts their own rights rather than someone else's rights. At least one of the named Plaintiffs, Russell Brothers Cattle Company, is a landowner whose property will allegedly be unconstitutionally taken by the Act. Russell Brothers thus satisfies this prong of the standing test. Because the other Plaintiffs bring the same facial challenges to the Act and seek the same declaratory relief as Russell Brothers, a determination of their individual standing is not necessary. *See id.* at 519.

### IV

Plaintiffs claim that the Act is unenforceable because the Legislature did not follow the constitutionally required notice procedures necessary to create the Authority. The Conservation Amendment of the Texas Constitution requires two types of notice for legislation creating a conservation or reclamation district such as the Authority: newspaper publication and delivery of a copy of the bill to the county commissioners courts and to the governing bodies of incorporated cities or towns where the district will be located or have jurisdiction. TEX. CONST. art. XVI, § 59(d), (e). However, only newspaper notice is required when amending legislation that previously created a conservation or reclamation district. TEX. CONST. art. XVI, § 59(d).

Before passing the 1993 Act, the Legislature provided notice by both newspaper publication and delivery to the requisite county commissioners courts and governing bodies of incorporated cities and towns. When the Act was amended in 1995, the Legislature provided only newspaper notice.

Plaintiffs do not challenge the notice provided for the original 1993 Act. Instead, they claim that the notice provided for the 1995 amendments was inadequate. Plaintiffs contend that because the 1995 Act was needed to remedy the 1993 Act, it was the 1995 Act that actually created the Authority; thus necessitating notice by both newspaper and delivery. We disagree.

■ The Authority was created in section 1.02 of the 1993 Act labeled "CREATION." That section provides: "A conservation and reclamation district, to be known as the Edwards Aquifer Authority, is created...." Act of May 30, 1993, *supra*, § 1.02. The 1993 Act was then amended in 1995 to remedy the voting rights objections of the Justice Department. Indeed, the language and text of the 1995 Act clearly establish that it did not create the Authority but merely amended the 1993 Act. The 1995 Act provides:

> Article 1, Chapter 626, Acts of the 73rd Legislature, Regular Session, 1993, [the Edwards Aquifer Authority Act], is *amended* by amending Section 1.09 and by adding Sections 1.091, 1.092, and 1.093 to read as follows:

Act of May 29, 1995, *supra*, § 1 (emphasis added). The amended and added sections do not create the Authority, but rather only deal with who may be elected or appointed as a director of the Authority. Because the 1995 Act merely amends the 1993 Act which created the Authority, the Texas Constitution requires only newspaper notice.

Plaintiffs next contend that the 1995 newspaper notice was insufficient because it did not provide enough details to give fair warning of the Act's consequences.

> The notice provided:
> NOTICE. Notice is hereby given of the intention to introduce a bill in the 74th Legislature to create a new, elected authority to manage the resources of the Edwards Aquifer. The board members of the newly created Edwards Aquifer Authority will be elected from Bexar, Comal, Hays, Medina, Uvalde, Atascosa, Caldwell and Guadalupe Counties. The board shall adopt rules necessary to carry out the authority's powers and duties.

■ The Conservation Amendment to the Texas Constitution requires the newspaper notice to set "forth the general substance of the contemplated law...." TEX. CONST. art. XVI, § 59(d). This provision does not require specific notice of every detail of the proposed legislation. Such detail would be nonsensical considering that some legislation is significantly changed from its original formulation. Notice is sufficient if it informs a reasonable person that the Legislature will consider issues which may be important to the affected public. The notice given was sufficient to inform those interested that the directors of the Authority would be elected. The Plaintiffs' active involvement in the legislative process evidences the sufficiency of the notice. *See Moore v. Edna Hosp. Dist.,* 449 S.W.2d 508, 514 (Tex.Civ.App.—Corpus Christi 1969, writ ref'd n.r.e.)(holding that required notice was sufficient because the public seemingly was aware of the issue and there was no showing that the notice actually misled any voters). We therefore hold that the Legislature properly complied with the notice requirements of the Conservation Amendment in enacting this legislation.

## V

Plaintiffs next argue that the Act is unconstitutional under article I, section 17 of the Texas Constitution as a taking of private property for public use without adequate compensation. Article I, section 17 provides:

No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; and, when taken, except for the use of the State, such compensation shall be first made, or secured by a deposit of money....

TEX. CONST. art. I, § 17. Plaintiffs agree that this clause does not proscribe the taking of property for public use; rather, it merely requires just compensation for the property taken. *Maher v. Lasater,* 163 Tex. 356, 354 S.W.2d 923, 924 (1962); *see also Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 297 n. 40, 101 S.Ct. 2352, 2371 n. 40, 69 L.Ed.2d 1 (1981). Thus, the Authority may constitutionally take property as long as it provides adequate compensation.

Plaintiffs claim that the Act violates the Texas takings clause in two ways. First, Plaintiffs argue that certain provisions of the Act will immediately operate upon the Act's effective date to result in a taking. Second, Plaintiffs argue that language of the Act requires the Authority to apply the Act in a manner that is unconstitutional. Each of these arguments will be examined in turn.

## A

Plaintiffs allege that two provisions of the Act will, immediately upon the effective date of the Act, operate to deprive them of their property without just compensation. They maintain that the Act's requirement that declarations of historical use be filed by March 1, 1994 will require all existing users to immediately cease withdrawing water once the Act goes into effect because that filing deadline has already passed and compliance with the deadline is now impossible. Additionally, Plaintiffs believe that permits issued by the Authority will not be transferable, thus depriving them of an important property right.

### 1

The Act requires existing users to file a declaration of historical use with the Authority by March 1, 1994. *See* Act of May 30, 1993, *supra,* § 1.16. Plaintiffs claim that this provision establishes an impossible condition because the March 1, 1994 deadline has already passed. The Authority was not operating on March 1, 1994, and it is still not operating today because of the delays in the implementation of the Act arising from the preclearance problem and this litigation. Plaintiffs maintain that the passed deadline precludes them from withdrawing any water upon the Act's eventual effective date.

The State urges that we should interpret the March 1, 1994 date as directory rather than mandatory. The State maintains that we should consider the intent of the Legislature and construe this date to merely require that the declarations be filed with the Authority six months after the eventual effective date of the statute. We agree with the State.

■ The Act originally was to become effective on September 1, 1993. Six months later, on March 1, 1994, declarations of historical use were to be filed with the Authority. The Legislature obviously did not foresee the delays that would preclude the Act from taking effect in 1993. If it had, the Legislature could have simply stated that declarations of historical use had to be filed six months after the effective date of the Act. We believe that the Legislature intended such a result. A contrary conclusion would allow litigants to forever frustrate legislation merely by obtaining a trial court ruling that temporarily stays the effectiveness of a new law.

■ Legislative intent supports our conclusion. To determine legislative intent, we examine the old law, the evil to be corrected, and the object to be obtained. *Crimmins v. Lowry*, 691 S.W.2d 582, 584 (Tex.1985); *see also Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex.1994). The Edwards Aquifer Act was intended to replace local regulation of the Edwards Aquifer by creating a regional authority possessing the power to manage and regulate groundwater withdrawals. Act of May 30, 1993, *supra*, §§ 1.06, 1.14. Because the Act provides for permits to be granted to existing users before any provision is made for future users, the Legislature obviously intended that existing users would have preference over future users. *Id.* §§ 1.16, 1.18. To implement this intent, the Legislature provided existing users the opportunity to file their declarations of historical use with the Authority after the effective date of the Act but before the allocation of water to other potential users. A contrary conclusion would require the fallacious reasoning that the Legislature intended the provisions favoring existing users to be subject to an impossible condition in the event of a delay in implementing the Act. Courts should not read a statute to create such an absurd result. *McKinney v. Blankenship*, 154 Tex. 632, 282 S.W.2d 691, 698 (1955).

We also disagree with Plaintiffs' argument that the Legislature's failure to amend the March 1, 1994 deadline in the 1995 Act evinces an intent to subject the existing-user provisions to an impossible condition. Even the State concedes that without some provision protecting existing users from a complete shutdown of their wells, this Act would not survive constitutional scrutiny under the takings clause. It is nonsensical to argue that the Legislature, in taking the trouble in 1995 to amend the Act to satisfy the Voting Rights Act concerns of the Justice Department, intended that the existing-user provision would be subject to an impossible condition that would render the entire Act unconstitutional and void.

■ An analysis of the constitutionality of a statute begins with a presumption of validity. *HL Farm Corp. v. Self*, 877 S.W.2d 288, 290 (Tex.1994); *Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 558 (Tex.1985); *Texas State Bd. of Barber Examiners v. Beaumont Barber College, Inc.*, 454 S.W.2d 729, 732 (Tex.1970). When possible, we are to interpret legislative enactments in a manner to avoid constitutional infirmities. *See Texas State Bd. of Barber Examiners*, 454 S.W.2d at 732; *Smith v. Patterson*, 111 Tex. 535, 242 S.W. 749, 750 (1922). We must resolve any ambiguities in the Act mindful of our obligation to reject interpretations which defeat the purpose of the legislation as long as another reasonable interpretation exists. *Citizens Bank v. First State Bank*, 580 S.W.2d 344, 348 (Tex.1979).

■ This Court has recognized that "[a] too literal construction of a statute, which would prevent the enforcement of it according to its true intent, should be avoided." *State v. Dyer*, 145 Tex. 586, 200 S.W.2d 813, 815 (1947). A court must attempt to ascertain what the Legislature intended and interpret the statute accordingly. *Union Bankers Ins. Co.*, 889 S.W.2d at 280. In keeping with this principle, statutory language that appears to impose a mandatory duty may be interpreted to be only directory when necessary to fulfill the legislative intent of the statute. *Chisholm v. Bewley Mills*, 155 Tex. 400, 287 S.W.2d 943, 945 (1956)(statute requiring filing of claim against state within thirty days held directory, not mandatory); *Thomas v. Groebl*, 147 Tex. 70, 212 S.W.2d 625, 630 (1948)(provision requiring annual re-

newal of certificate of exemption from poll tax held directory).

In *Stephenson v. Stephenson*, 22 S.W. 150 (Tex.1893), we held that a statute requiring transcripts to be filed with the newly created courts of civil appeals within ninety days after the notice of appeal did not apply to certain litigants. The litigant in *Stephenson* had tendered his transcript more than ninety days after the notice of appeal because the courts of civil appeals had not yet become operational. This Court, relying on legislative intent, interpreted the Act to allow the transcript to be filed ninety days from the time the appellate court clerk began operations. *Id.* at 151.

Similarly, we hold today that the March 1, 1994 deadline contained in the Act was intended to provide existing users six months to file their declarations of historical use. In accordance with the legislative intent, we interpret the Act as requiring declarations of historical use to be filed six months after the Authority becomes effective.

### 2

Plaintiffs also allege that the Act is an unconstitutional taking because the "use" of water runs with the landowner personally, rather than with the land. As such, they fear a landowner would be unable to transfer the permit to a future owner of that property. Additionally, Plaintiffs are concerned that the Act would prevent a landowner seeking a permit from relying upon previous owners' historical water usage when determining the amount of water withdrawal allowed by the Authority. As a result, the Act on its face would reduce the value of a landowners' property by diminishing the amount of water withdrawal and restricting transferability of the permit.

Section 1.15 of the Act prevents a "person" from withdrawing water without a permit. *See* Act of May 30, 1993, *supra*, § 1.15. Permits will be available to "existing users" who file a timely declaration of historical use of water withdrawn from the aquifer. *Id.* § 1.16. The permits will specify the maximum rate and total volume that the "water user" may withdraw in a calendar year. *Id.* § 1.15.

The Act does not define "user" and does not specify whether the use of water runs with the land. It is therefore unclear whether a "user" includes prior and future owners of the land, or whether a "user" is only the landowner in possession of the land at the time a permit is requested. The State urges that the more reasonable interpretation is that a "user" would include prior and future landowners. Under this interpretation, historical use could be established through previous landowners' withdrawals from the well, and permits could be transferred to future owners of the land.

We agree with the State's interpretation that the term "user" includes at least prior and future landowners.[3] Accordingly, we conclude that the "use" of water runs with the land and, as such, does not constitute a taking of the landowners' property.

### B

Plaintiffs also contend that an unconstitutional taking of private property will occur if a landowner is denied a permit to drill a water well. Landowners who may be denied a water permit include those who own land without historical use prior to June 1, 1993. The State admits that some landowners may potentially be denied permits, but argues that such denial is not a taking. However, we need not resolve this argument to determine whether the Act is constitutional on its face.

Assuming without deciding that Plaintiffs possess a vested property right in the water beneath their land, the State still can take the property for a public use as long as adequate compensation is provided. The Act expressly provides that the Legislature "intends that just compensation be paid if implementation of [the Act] causes a taking of private property or the impairment of a contract in contravention of the Texas or

---

3. This holding does not necessarily limit the definition of "users" to individuals owning land. Under some circumstances, an entity that does not own the land or the well may be considered a "user" if the entity had some right to withdraw water.

federal constitution." Act of May 30, 1993, *supra,* § 1.07. Based on this provision in the Act, we must assume that the Legislature intends to compensate Plaintiffs for any taking that occurs. As long as compensation is provided, the Act does not violate article I, section 17.

Plaintiffs claim that the Authority will not possess sufficient funds to compensate them for the taking of their property. This argument is entirely speculative. If an individual landowner's property is taken and no compensation is provided, that landowner may then bring a challenge to the Act as it is applied or pursue other possible remedies. It will be the landowner's burden to establish a vested property right in the underground water which the Authority eviscerated. The landowner will also have to prove damages and the failure to receive adequate compensation from the State. If a landowner establishes such a case, then the Act may be held unconstitutional "as applied." [4]

At this time, any violation of article I, section 17 is hypothetical. We therefore conclude that Plaintiffs cannot meet their burden in this facial challenge of establishing that, under all circumstances, the Act will deprive them of their property in violation of the Texas Constitution.

## VI

Plaintiffs also assert that the Act violates the equal protection clause of the Texas Constitution. Plaintiffs first allege that the Act is unconstitutional because it provides preferential allocation of water to existing users who withdrew water on or before May 31, 1993. Plaintiffs urge that this preference discriminates against landowners who did not withdraw water before that date.

██ The Texas Constitution provides the following equal protection guarantee:

All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate

public emoluments, or privileges, but in consideration of public services.

TEX. CONST. art. I, § 3. Generally, a classification under an equal protection challenge must only be rationally related to a legitimate state purpose. *Richards v. LULAC,* 868 S.W.2d 306, 310–11 (Tex.1993); *Stamos,* 695 S.W.2d at 559. However, classifications impinging upon the exercise of a fundamental right or distinguishing between individuals on a suspect basis, such as race or national origin, are subject to strict scrutiny, requiring that the classification be narrowly tailored to serve a compelling government interest. *Richards,* 868 S.W.2d at 311.

Plaintiffs make no claim that the Act's classifications distinguish between individuals on a suspect basis. Although they allege that the legislation is subject to strict scrutiny because it impinges upon their fundamental property rights, they cite no authority to support this proposition.

The United States Supreme Court generally uses the rational basis test for equal protection challenges to economic or property regulation. *See City of New Orleans v. Dukes,* 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976). *See also generally Ferguson v. Skrupa,* 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed.2d 93 (1963); *Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 424, 72 S.Ct. 405, 407–08, 96 L.Ed. 469 (1952)(regulations causing financial burdens for which no compensation is paid are not constitutionally infirm as long as there is a rational basis). In *Dukes,* the United States Supreme Court applied a rational basis test to an ordinance that prohibited street vendors from operating in the French Quarter except for the two vendors who had operated there for more than eight years. This New Orleans ordinance, like the Edwards Aquifer Act, classified economic rights on the basis of the past use of the rights.

██ Similarly, Texas cases have applied a rational basis test to uphold the constitutionality of zoning ordinances and other regula-

---

4. In a related argument, Plaintiffs urge that compensation is required in advance of a taking. However, they do not provide any authority to support this argument, and we have found none.

We therefore reject the premise that the Texas Constitution requires compensation in advance of a taking.

tions that affect economic rights. *Lombardo v. City of Dallas,* 124 Tex. 1, 73 S.W.2d 475, 482–85 (1934); *McEachern v. Town of Highland Park,* 124 Tex. 36, 73 S.W.2d 487, 487 (1934); *see also Lens Express, Inc. v. Ewald,* 907 S.W.2d 64, 68–69 (Tex.App.—Austin 1995, no writ); *Town of Sunnyvale v. Mayhew,* 905 S.W.2d 234, 266 (Tex.App.—Dallas 1994, writ requested). In accordance with these precedents, we conclude that the rational basis test applies to Plaintiffs' equal protection claims.

Under the rational basis test, the Act is valid under section 3 of the Texas Bill of Rights as long as it is rationally related to a legitimate state purpose. *See Garcia,* 893 S.W.2d at 524. Plaintiffs argue that the cut-off date of May 31, 1993 that distinguishes between existing users and new users is arbitrary and irrational and not rationally related to a legitimate state purpose. We disagree.

■ One of the objectives of the Act is to control increased demand on the aquifer while protecting historical users of aquifer water. The Act attempts to accomplish this goal by allowing "existing users" the first opportunity to withdraw water. The May 31, 1993 date utilized by the Legislature for historical use is rational and is reasonably related to the Legislature's goal of precluding increased demand in the aquifer. The Legislature passed the Act on May 30, 1993, one day before the historic use cut-off. This allowed all existing wells to continue pumping while precluding landowners from rushing to establish preferred rights through future drilling after the passage of the Act. This protected both existing users and the aquifer. Absent a cut-off date of May 31, 1993, or some earlier date, the purpose of regulating water usage could easily be eviscerated by innumerable new wells.

■ Plaintiffs also argue that the Act violates the equal protection clause because the Legislature did not include Kinney County within the boundaries of the Authority. A similar challenge was rejected in *Beckendorff,* 558 S.W.2d at 81. The *Beckendorff* court held that there was no constitutional requirement for the legislatively created subsidence district to extend beyond Harris and Galveston counties, although legitimate ob-

jects of regulation existed outside those counties. *Id.* The equal protection clause, the court reasoned, "relates to persons as such, and not to areas." *Id.*; *see also Richards,* 868 S.W.2d at 311–12 (geographical equality not required under the equal protection clause). This Court, although refusing the *Beckendorff* writ of error with the notation "no reversible error," expressly approved of the court of appeals' reasoning. 563 S.W.2d at 240. In fact, we specifically stated that there was "no denial of the equal protection of the law in either the geographic scope of the [subsidence district] or in its operation." *Id.* Similarly, the fact that this Act may be under-inclusive by not including Kinney County within the territorial limits of the Authority is not a violation of the equal protection clause. *See also generally Railway Express v. New York,* 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949)("It is no requirement of equal protection that all evils of the same genus are to be eradicated or none at all."). We therefore conclude that Plaintiffs' equal protection challenges are without merit.

## VII

Plaintiffs also assert that the Act violates the Texas due course of law provision. This clause provides:

> No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

TEX. CONST. art. I, § 19. This guarantee, similar to the federal due process clause, contains both a procedural component and a substantive component. *Garcia,* 893 S.W.2d at 525; *Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140 (Tex.1977). Plaintiffs contend that the Act violates both components.

■ First, Plaintiffs argue that the Act will deprive them of their property without procedural due course of law. They allege that the Authority will make decisions regarding their property that will not be subject to any type of judicial review. We disagree with Plaintiffs' claim that the Act does not provide for judicial review.

The Act provides that the Authority "is subject ... to the Administrative Procedure and Texas Register Act." Act of May 30, 1993, *supra*, at § 1.11(h). This language has meaning only if it requires the Authority to abide by the provisions of the Administrative Procedure and Texas Register Act. That act provides for contested case hearings and judicial review of the findings from such hearings under the substantial evidence rule. TEX. GOV'T CODE §§ 2001.171–.178. Moreover, the State concedes that the Authority will hold contested case hearings and its determinations will be subject to judicial review. Under these circumstances, we conclude that Plaintiffs have not met their burden to establish that the Act will always operate to deprive them of their property without due course of law.

■ Second, Plaintiffs urge that the Act violates the substantive component of the due course of law provision. Plaintiffs claim that the Act has no rational basis and is an overbroad application of the police power. We disagree.

Water regulation is essentially a legislative function. The Conservation Amendment recognizes that preserving and conserving natural resources are public rights and duties. TEX. CONST. art. XVI, § 59(a). The Edwards Aquifer Act furthers the goals of the Conservation Amendment by regulating the Edwards Aquifer, a vital natural resource which is the primary source of water in south central Texas. The specific provisions of the Act, such as the grandfathering of existing users, the caps on water withdrawals, and the regional powers of the Authority, are all rationally related to legitimate state purposes in managing and regulating this vital resource. The Act is sufficiently rational to meet constitutional due course requirements. We therefore conclude that Plaintiffs have not met their burden to establish that the Act is unconstitutional under the substantive component of the due course of law clause.

## VIII

Plaintiffs also challenge the Act under article I, section 16 of the Texas Constitution, which provides:

No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made.

TEX. CONST. art. I, § 16. Plaintiffs claim the Act violates this provision because it is an ex post facto law, a retroactive law, and it impairs the obligation of contracts. We will examine each of these claims in turn.

■ Plaintiffs' first argument, that the Act is an ex post facto law, misses the mark. It is well established that the prohibition against ex post facto laws applies only to retroactive criminal or penal laws. *Bender v. Crawford*, 33 Tex. 745, 751 (1871); *see also De Cordova v. Galveston*, 4 Tex. 470, 473 (1849); *Holt v. State*, 2 Tex. 363, 364 (1847). Because the Act is not a retroactive criminal or penal law, the Act is not unconstitutional as an ex post facto law.

■ Separately, Plaintiffs urge that the Act is a retroactive law in violation of the Texas Constitution. Under our state charter, retroactive laws affecting vested rights that are legally recognized or secured are invalid. *See Texas Water Rights Comm'n v. Wright*, 464 S.W.2d 642, 648–49 (Tex.1971). Plaintiffs maintain that the Act is retroactive because the amount of water a landowner is allowed to withdraw is determined from action or inaction taken before the passage, signing, or effective date of the Act.[5]

■ Plaintiffs are correct that the Act may have retroactive effects. This Court recognized in *Wright* that a statute which allows an agency to take into consideration conduct occurring before the effective date of the statute possesses a retroactive effect. 464 S.W.2d at 648. The Edwards Aquifer Act, similar to the statute in *Wright* that was held to be retroactive, takes into account the landowner's use of water in the years preceding the effective date of the legislation in determining future entitlement to water. However, "[m]ere retroactivity is not sufficient to invalidate a statute." *Id.* A valid

---

**5.** Plaintiffs also urge that the Act is retroactive due to the March 1, 1994 deadline for filing declarations of historical use. However, our holding that this deadline is to be extended six months from when the Authority becomes effective moots this argument.

exercise of the police power by the Legislature to safeguard the public safety and welfare can prevail over a finding that a law is unconstitutionally retroactive. *See Texas State Teachers Ass'n v. State,* 711 S.W.2d 421, 424 (Tex.App.—Austin 1986, writ ref'd n.r.e.)(the rule against retroactive laws is not absolute and should yield to a state's right to safeguard the public safety and welfare); *Ismail v. Ismail,* 702 S.W.2d 216, 222 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.)("overriding public interest" justified the retroactive application of a special class of marital property); *Kilpatrick v. State Bd. of Registration for Professional Eng'rs,* 610 S.W.2d 867, 871 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.)(concern for public safety and welfare can override retroactive law prohibition); *State Bd. of Registration for Professional Eng'rs v. Wichita Eng'g Co.,* 504 S.W.2d 606, 608 (Tex.Civ.App.—Fort Worth 1973, writ ref'd n.r.e.)(same); *Caruthers v. Board of Adjustment,* 290 S.W.2d 340, 345 (Tex.Civ.App.—Galveston 1956, no writ)(zoning ordinance was not unconstitutionally retroactive because it was justified by the police power). *See also generally Texas State Bd. of Barber Examiners,* 454 S.W.2d at 732 (barber college challenging statute as a retroactive law merely had right of protection from unreasonable exercise of police power). We agree with the reasoning of these decisions.

■■■ The Act provides that the Authority is "required for the effective control of the [aquifer] to protect terrestrial and aquatic life, domestic and municipal water supplies, the operation of existing industries, and the economic development of the state." Act of May 30, 1993, *supra,* § 1.01. The Legislature also found that the aquifer was "vital to the general economy and welfare of this state." *Id.* § 1.06(a). Based on these legislative findings, we conclude that the Act is necessary to safeguard the public welfare of the citizens of this state. Accordingly, the retroactive effect of the statute does not render it unconstitutional.

Plaintiffs argue, however, that our holding in *Wright* that the statute at issue was constitutional was premised on the fact that the statute provided the affected parties a reasonable time to protect their interests. *Wright,* 464 S.W.2d at 648. Plaintiffs point out that the Edwards Aquifer Act, in contrast, does not allow them a reasonable time to protect their interests since the historical use period ended the day after the Legislature passed the Act. While *Wright* was indeed based on the provisions in the statute providing time for the landowners to protect their interests, it does not address the issue of whether the prohibition against retroactive laws precludes the Legislature from enacting statutes that are necessary to safeguard the public safety and welfare. We conclude that article I, section 16 does not absolutely bar the Legislature from enacting such statutes. *Wright* therefore does not lead to the conclusion that the Act is an unconstitutional retroactive law.

Finally, Plaintiffs maintain that the Act unconstitutionally impairs the obligation of contracts under article I, section 16. This Court has not considered the scope of the contract clause contained in the Texas Constitution since our 1934 decision in *Travelers' Ins. Co. v. Marshall,* 124 Tex. 45, 76 S.W.2d 1007 (1934). In *Travelers',* we determined that the police power did not justify a moratorium statute enacted during the Depression that precluded note holders from foreclosing on real property in accordance with the terms of the note when such a foreclosure would be inequitable to the debtor. *Id.* 76 S.W.2d at 1010–11. After a lengthy historical analysis, we held that the very purpose of the clause prohibiting the impairment of contracts was to void such moratory legislation regardless of the exigencies of the time. *Id.* at 1023–25.

Two years later, the United States Supreme Court considered the Texas contract clause and concluded that *Travelers'* only applied to statutes specifically directed against the terms of a contract; therefore, police power regulations dealing with physical things such as land or natural resources could have incidental effects on contracts if the power was exercised in the interest of the public welfare. *See Henderson Co. v. Thompson,* 300 U.S. 258, 266, 57 S.Ct. 447, 451, 81 L.Ed. 632 (1937). While the Supreme Court's decision in *Henderson* was not

controlling on Texas courts, several courts of appeals have noted its holding in concluding that an exercise of the police power necessary to safeguard the public safety and welfare can justify the impairment of contractual rights and obligations. *See Texas State Teachers Ass'n,* 711 S.W.2d at 424–25 & n. 2; *Dovalina v. Albert,* 409 S.W.2d 616, 619 (Tex. Civ.App.—Amarillo 1966, writ ref'd n.r.e.); *Biddle v. Board of Adjustment,* 316 S.W.2d 437, 440–41 (Tex.Civ.App.—Houston 1958, writ ref'd n.r.e.).

■ Other Texas cases, including an older decision from this Court, have likewise concluded that the contract clause may yield to statutes which are necessary to safeguard the public safety and welfare. *See State v. Delesdenier,* 7 Tex. 76, 99–100 (1851); *Texas Water Comm'n v. City of Fort Worth,* 875 S.W.2d 332, 335 (Tex.App.—Austin 1994, writ denied); *Kilpatrick,* 610 S.W.2d at 871; *Andrada v. City of San Antonio,* 555 S.W.2d 488, 491 (Tex.Civ.App.—San Antonio 1977, writ dism'd w.o.j.); *Wichita Eng'g Co.,* 504 S.W.2d at 608. Accordingly, we determine that the Act is not invalid under the contract clause because it is a valid exercise of the police power necessary to safeguard the public safety and welfare. The Act is therefore not subject to any of Plaintiffs' facial attacks under article I, section 16 of the Texas Constitution.

### IX

Plaintiffs next challenge the Act on separation of powers grounds. Article II, section 1 of the Texas Constitution provides:

no person, or collection of persons, being one of [the three governmental branches], shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

TEX. CONST. art. II, § 1. Plaintiffs allege that, through the permitting process, the Authority will have to determine the nature and extent of landowners' property rights to water beneath their land. They maintain that this process is a judicial function that cannot be performed by an agency of the executive branch.

■ Typically, the power to determine controverted rights to property by means of binding judgment is vested in the judicial branch. *Board of Water Eng'rs v. McKnight,* 111 Tex. 82, 229 S.W. 301, 304 (1921); *see also State v. Flag–Redfern Oil Co.,* 852 S.W.2d 480, 484 (Tex.1993). Nevertheless, this principle does not bar administrative agencies of the executive branch of government from working in tandem with the judicial branch to administer justice under appropriate circumstances. Administrative fact findings are a necessary aspect of administrative discretion and are not an exclusively judicial function. *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961, 967–68 (1945). In *Flag–Redfern,* we acknowledged that "[a]n administrative agency is not a 'court' and its contested case proceedings are not lawsuits, ... Agency adjudications do not reflect an exercise of the judicial power assigned to the 'courts' of the State ...; they are simply executive measures taken in the administration of statutory provisions." 852 S.W.2d at 485 n. 7.

■ We conclude that the Act does not violate separation of powers because the well-permitting process will encompass only administrative contested proceedings, not binding judicial determinations. The permitting decisions will bear upon the use of groundwater, but will not constitute an adjudication of title to property. There is simply nothing in the Act suggesting that the Authority will adjudicate property rights. The decisions that the Authority will have to make before issuing a permit, such as whether an applicant is a historical user and the amount of past use, will be fact findings, not determinations of controverted rights to property. These decisions are similar to the fact findings made by the Railroad Commission to adjust correlative rights. We held in *Corzelius* that such findings do not violate separation of powers. *See* 186 S.W.2d at 963. Similarly, we find that the Edwards Aquifer Act does not violate separation of powers as an infringement upon the judicial power.

This conclusion is buttressed by the fact that the Authority's determinations will be subject to judicial review under the Administrative Procedure and Texas Register Act.

*See Corzelius,* 186 S.W.2d at 963 (considering availability of judicial review in holding that Railroad Commission orders adjusting correlative rights did not violate separation of powers). Under such circumstances, we cannot agree with Plaintiffs' argument that the permits are binding judicial determinations by an agency in violation of the separation of powers doctrine.

## X

Separately, Plaintiffs assert a related challenge that the Edwards Aquifer Act violates the open courts, right to trial by jury, and separation of powers provisions of the Texas Constitution to the extent that the Act does not provide for court adjudication of permitting decisions or other matters decided by the Authority. *See* TEX. CONST. art. I, §§ 13 & 15; art. II, § 1; art. V, § 10.

## A

As discussed in the preceding section, the permit process of the Authority is not a binding judicial determination. Instead, the permit process is clearly within the purview of agency fact findings. These fact findings are subject to judicial review under the provisions of the Administrative Procedure and Texas Register Act. We therefore conclude that the permitting process does not violate separation of powers.

## B

The Texas Constitution provides two guarantees of the right to trial by jury:

> The right to trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency. . . .

TEX. CONST. art. I, § 15.

> In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury. . . .

TEX. CONST. art. V, § 10.

■ Article I, section 15 provides a right to trial by jury for those actions, or analogous actions, which were tried by jury when the Texas Constitution was adopted in 1876. *Garcia,* 893 S.W.2d at 526; *Texas Ass'n of Business v. Air Control Bd.,* 852 S.W.2d 440, 450–51 (Tex.1993). It therefore only applies if, in 1876, a jury would have been allowed to try the action or an analogous action. In *Texas Ass'n of Business,* we examined the article I, section 15 right to jury trial and concluded that agency assessments of environmental penalties were neither actions tried by a jury in 1876 nor actions analogous to matters for which a jury trial was allowed at that time. 852 S.W.2d at 451. We based our holding on the emergence of the administrative branch to regulate the environment, and our conclusion was that no such governmental scheme existed to balance economic concerns with environmental concerns in 1876. *Id.* Similarly, we conclude that there was no governmental scheme in 1876 to regulate natural resources such as the Edwards Aquifer. We therefore hold that no right to jury trial under article I, section 15 of the Texas Constitution attaches to appeals from the permit adjudications under the Act since these are not actions, or analogous actions, which were tried to a jury at the time the Texas Constitution was adopted.

■ We next consider the right to trial by jury protected by article V, section 10 of the Texas Constitution. This provision protects the right to have a jury resolve fact questions in all "causes" brought in the district courts. *See Garcia,* 893 S.W.2d at 527; *State v. Credit Bureau,* 530 S.W.2d 288, 292–93 (Tex.1975). Appeals from administrative decisions, however, are not "causes" within the meaning of this provision. *Garcia,* 893 S.W.2d at 526; *Credit Bureau,* 530 S.W.2d at 293. Thus, no right to jury trial attaches to appeals from administrative decisions, and the Act does not violate article V, section 10 of the Texas Constitution.

## C

■ The Texas Constitution provides the following "open courts" guarantee:

> All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

TEX. CONST. art. I, § 13. This provision includes three separate constitutional rights: (1) courts must actually be available and operational; (2) the Legislature cannot impede access to the courts through unreasonable financial barriers; and (3) meaningful remedies must be afforded, "so that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress." *Garcia,* 893 S.W.2d at 520; *Trinity River Auth.,* 889 S.W.2d at 261; *Texas Ass'n of Business,* 852 S.W.2d at 448.

■ We cannot discern that any of the open court guarantees are even implicated by the permitting process of the Authority. The courts are available and operational to Plaintiffs after an appeal from a decision of the Authority; the Legislature has not provided any unreasonable financial barrier to impede Plaintiffs' access to a permit decision or an appeal of that decision; and the Act has not abrogated any right to assert a well-established common law cause of action. We conclude that the permitting process contained in the Edwards Aquifer Act does not violate the open courts provision of the Texas Constitution.

## XI

■ Plaintiffs' final constitutional challenge is that the Act violates the open courts, right to trial by jury, and separation of powers provisions of the Texas Constitution to the extent that the Act would require a person desiring to appeal the imposition of an administrative penalty to pay the penalty prior to taking the appeal. *See* TEX. CONST. art. I, §§ 13 & 15; art. II, § 1; art. V, § 10. We have held that provisions in statutes requiring prepayment of administrative penalties as a prerequisite to judicial review are unconstitutional. *Flag–Redfern,* 852 S.W.2d at 485; *Texas Ass'n of Business,* 852 S.W.2d at 449–450. However, we expressly recognized in *Texas Ass'n of Business* that an administrative agency can be constitutionally granted the right to collect assessed penalties, as long as the payment of the penalties is not tied to the right to judicial review. 852 S.W.2d at 449–50; *see also Cen-*

*tral Appraisal Dist. of Rockwall County v. Lall,* 924 S.W.2d 686, 690 (Tex.1996). In other words, only when the payment of the administrative penalty is a prerequisite to judicial review does the payment run afoul of the constitution.

■ The Edwards Aquifer Act, however, does not require the prepayment of any penalty prior to seeking judicial review. Section 1.37(j)(3) of the Act expressly provides that a person may file a petition for judicial review without paying the amount of the penalty. Act of May 30, 1993, *supra,* § 1.37(j)(3). If the penalty is not paid or its enforcement stayed by filing a pauper's oath or a supersedeas bond, the State may attempt to collect the penalty, but such event does not affect the person's right to judicial review. *Id.* § 1.37(k) & (m). Thus, the Act does not unconstitutionally require prepayment of a penalty prior to seeking judicial review.

## XII

■ Our final consideration is the trial court's award of attorney's fees to Plaintiffs. Plaintiffs brought this lawsuit pursuant to the Texas Uniform Declaratory Judgments Act. This Act provides that the trial court "may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM.CODE § 37.009. The granting or denial of attorney's fees in a declaratory judgment action is within the trial court's discretion. *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985).

The district court granted Plaintiffs attorney's fees based on its finding that Plaintiffs had "substantially prevailed" in the litigation. Because this finding may no longer be valid, the State claims that the award of attorney's fees must be reversed. Moreover, the State argues that it should now be awarded attorney's fees as a prevailing party in this litigation.

Despite these arguments, the award of attorney's fees in declaratory judgment actions is clearly within the trial court's discretion and is not dependent on a finding that a party "substantially prevailed." We will therefore remand this cause to the district court for it to consider and exercise its dis-

cretion on the amount of attorney's fees, if any, which should be awarded to the parties in this case.[6]

## XIII

In conclusion, we uphold the validity of the Act against the facial constitutional challenges brought by Plaintiffs. We reverse the district court's judgment and render judgment in favor of the State. The injunction ordered by the district court is dissolved. We remand the cause to the district court to exercise its discretion as to whether attorney's fees should be awarded to either party.

---

**6.** The Edwards Underground Water District also brought a direct appeal to this Court urging that the district court abused its discretion by requiring it to pay Plaintiffs' attorney's fees. Because we are remanding the issue of attorney's fees, we need not address this argument.