TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00308-CV






Stable Energy, L.P. and Anchor Operating Company, Appellants




v.




Kachina Oil & Gas, Inc.; Bank of America, N.A. (Successor in Interest to NationsBank of


Texas, N.A.), as Trustee u/w/o John Murchison, a/k/a the John C. Murchison Trust;


Torch Energy, Inc.; Edmund Kappler; and Ruben Kappler, Appellees







FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155
TH JUDICIAL DISTRICT


NO. 92V-248, HONORABLE FRED A. MOORE, JUDGE PRESIDING







 Appellants, Anchor Operating Company and Stable Energy, L.P. (collectively
"Stable") seek the reversal of a final judgment entered in favor of appellees (collectively "Kachina")
regarding the ownership interests and rightful operator of an oil and gas well in Fayette County. 
Because we conclude that Stable failed to prove it acquired a majority interest in the well, we will
affirm the district court judgment.


THE CONTROVERSY

 This case involves a dispute over the ownership and operation of the Triangle K No.
1 Well in Fayette County ("the well"). In 1980, the original owners of the well entered into a joint
operating agreement ("JOA") and designated CRB Oil & Gas as the operator. In the following years,
the title of "operator" changed hands several times and eventually became the focal point of the
parties' dispute. In 1983, CRB delegated the operation of the well to K-N Operating on a
subcontract basis. A few years later, CRB filed for bankruptcy. The chapter 7 trustee executed a
Texas Railroad Commission Form P-4 designating K-N as the operator. In 1990, K-N executed
another Form P-4 designating its affiliate, MGN Oil & Gas Corporation, as the operator. In 1991,
MGN changed its name to Kachina Oil & Gas, Inc., one of the appellees. Although the original
operator, CRB, owned a working interest in the well, the succeeding operators, K-N and
MGN/Kachina, had no working interest when they were designated as operator.

 In 1989, Pampell Interests became a party to the JOA by purchasing a minority
interest in the well at a foreclosure sale. Subsequently, Pampell Interests was merged into Stable
Energy. (1) Stable and Anchor, the appellants, are affiliates and were owned and controlled by a single
individual, the late Alfred W. Pampell.

 The JOA governs the contractual relationship of the owners of the well. It designates
management of the contract area to the operator, who sends monthly bills to the working interest
owners for their share of the costs ("joint interest billings"). The JOA grants the operator a lien on
the interests of any party in default on their joint interest billings. Prior to any major operations, such
as drilling a new well or reworking an existing one, the operator is required to present a detailed
proposal of the project to the working interest owners in an authorization for expenditure ("AFE"),
requesting contributions from the owners. The JOA penalizes those who choose not to participate
with relinquishment of their interests in that well upon commencement of the proposed operation.

 In September 1992, Kachina sent an AFE notifying the working interest owners that
the well had ceased production and that the lease would terminate if production did not resume. The
AFE proposed a workover operation to clean the wellbore and requested the participation of the
owners. Stable consented to the project and delivered its share of the costs. In addition, Stable later
agreed to assume the costs attributable to the parties who had elected not to participate ("non-consenting parties"). At this point, Stable already held a thirty-three percent interest in the well, and
the non-consenting parties held approximately a twenty-eight percent interest. On November 19,
1992, Stable mailed a second check to Kachina with the written condition that the check only be
applied to Stable's "purchase of its portion of the . . . non-consent interest." However, Stable was
already in default on its joint interest billings for the well, and Kachina advised Stable that it was
undecided how to apply the monies it had on hand from Stable. Consequently, Kachina retained the
funds in an escrow account.

 Although Stable sent checks for the proposed project, Stable and Kachina were in
dispute at the time regarding operation of the well and Stable's past due joint interest billings. 
Throughout November 1992, Stable's attorneys corresponded with Kachina, expressing disapproval
of Kachina's proposed project and threatening to sue. Stable claimed that it was the operator and
would take control of the well. On November 25, 1992, Kachina obtained an extension on the lease,
which was on the verge of expiration, to gain time to resolve these issues with Stable. On or about
that same day, Stable's affiliate, Anchor, cut the locks from the gate and took possession of the well. 
For several weeks, Anchor conducted an acid workover on the well to access new reserves. With
Anchor in possession of the well, Kachina withdrew its AFE on or about December 10, 1992.

 Stable filed suit in December 1992, seeking an accounting and declaratory judgment
that Anchor was the operator. In response to the request for an accounting, the trial court appointed
a master and subsequently signed an order pursuant to the master's report. In January 1994, the
district court rendered a final summary judgment in favor of Kachina. This Court reversed and
remanded for further proceedings. (2) On remand, Stable additionally requested damages, and Kachina
responded with a request for declaratory judgment and payment of Stable's delinquent joint interest
billings. The district court conducted a bench trial and rendered a final judgment in favor of
Kachina. The court failed to find that Stable acquired ownership of the non-consent interests and
that Anchor was the lawful operator of the well. The court awarded Kachina its attorney's fees and
sums for past due joint interest billings against Stable and Anchor. In satisfaction of the amounts
awarded, the court ordered Kachina's lien against Stable's interests in the well foreclosed. Stable
seeks reversal of the judgment and reimbursement for reworking the well.


DISCUSSIONStandard of Review

 After conducting a bench trial, the trial court issued findings of fact and conclusions
of law. Stable challenges several findings and the legal and factual sufficiency of the evidence
supporting the judgment. When reviewing a verdict to determine the factual sufficiency of the
evidence, we must consider and weigh all the evidence and should set aside the judgment only if it
is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951);
see generally William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence" and "Insufficient
Evidence," 69 Tex. L. Rev. 515 (1991) [hereinafter Powers]. Appellant's legal-sufficiency argument
is a "conclusive evidence" point of error: appellant attempts to overcome, as a matter of law, an
adverse fact finding on an issue for which it had the burden of proof. To resolve such a point, we
must ask whether there is no evidence to support the finding. If there is no evidence to support the
finding, we must then examine the entire record to see if appellant's contrary proposition is
established as a matter of law. A party establishes a proposition as a matter of law if reasonable
minds would not differ in drawing the same conclusion. Sterner v. Marathon Oil Co., 767 S.W.2d
686, 690 (Tex. 1989); Holley v. Watts, 629 S.W.2d 694, 696 (Tex. 1982); see Powers, 69 Tex. L.
Rev. 518, 523.


Ownership and Operation of the Well

 Under the JOA, ownership of the well can shift when parties elect not to participate
in an operation. The non-consenting parties relinquish their interests in the well to the consenting
parties who perform the operations. In addition, the JOA dictates the method for choosing or
changing operators. The JOA declares that the operator must have an ownership interest; if not, then
the operator can be replaced. To do so, however, the owners must select a successor operator by
majority vote. Stable claims to have acquired a majority interest and elected Anchor as successor
operator under these procedures.

 Stable first contends that the trial court erred in ruling that Stable failed to prove it
acquired a majority working interest in the well. Initially in 1989, Stable acquired a thirty-three
percent interest in the well. In 1992, Kachina sent the AFE for the workover, receiving the consent
of some owners, but not all. Kachina notified Stable that an approximate twenty-eight percent
interest, owned by the non-consenting parties, was available if Stable chose to assume those
interests. Kachina stated in a letter that Stable's "payment of $4478.21 will earn [Stable] an
additional .2798881 interest in the well." In response, Stable sent Kachina a check for that amount
with the written condition that the funds only be applied to purchase of the non-consent interest. 
Stable points to this transfer of funds as the moment when Stable became the majority interest owner
in the well. Stable claims that the non-consenting parties relinquished their twenty-eight percent
interest upon tender of this check, bringing Stable's total ownership interest to approximately sixty-one percent.

 Relinquishment of non-consenting interests is governed by article VI.B.2 of the JOA: 
"Upon commencement of operations for the . . . reworking . . . of any such well by Consenting
Parties . . . each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties
. . . all of such Non-Consenting Party's interest in the well and share of production therefrom." 
(Emphasis added.)

 Thus, the JOA does indeed provide that the parties who choose not to participate in
the project forfeit their interests in the well. However, this provision specifies that relinquishment
occurs upon commencement of operations. Contrary to Stable's contention that tender triggered
relinquishment, the JOA mandates that ownership of non-consent interests could not have transferred
to Stable until--at the earliest--the date when the workover began. See Abraxas Petroleum Corp.
v. Hornburg, 20 S.W.3d 741, 754-55 (Tex. App.--El Paso 2000, no pet.).

 For this reason, only actual commencement of Kachina's proposed project could have
triggered relinquishment of the non-consent interests. Kachina itself withdrew the AFE and never
began the operation. Stable argues that the project proposed by Kachina commenced when Anchor
seized the well and performed an acid workover. However, Anchor's activities only constituted a
legitimate commencement if (1) the operations performed were the same as those described in the
AFE, and (2) the operations were performed by a duly elected operator.


 1. Operations Performed

 Article VI.B. requires that operations be preceded by an AFE requesting approval
from the owners. The AFE must inform owners of the "location, proposed depth, objective
formation and the estimated cost" so that they may decide whether to participate. In the instant case,
the non-consenting parties, whose interests Stable hoped to acquire, had declined to approve the AFE
sent by Kachina. That is the project in which those parties elected not to participate and
consequently made their interests vulnerable to relinquishment. For Kachina's AFE to cover the
operations performed by Anchor, the operations must be as described in that AFE and as declined
by the non-consenting parties.

 Stable argues that the workover Anchor performed was substantially similar to
Kachina's proposal because both can be labeled a "workover." However, Kachina did not merely
obtain approval from the parties for a "workover." The AFE specified mechanics and costs that
varied substantially from the operations Anchor performed. Documents put into evidence and the
experts' testimony indicate that the Anchor operation was designed to open new productive zones,
rather than to merely clean existing perforations, as Kachina had planned. Anchor's operation
required over twice as much acid, and the cost incurred (over $33,500) was more than twice the cost
proposed by Kachina ($16,000). Stable's own witness, Frank Klepper, an expert on oilfield
operations, described Kachina's proposal for a "5,000 gallon acid job" as a "very small . . . clean-up
acid job." In contrast, Mr. Klepper stated that Anchor's project was designed to "open some new
zones . . . open up more of the reservoir," which "required the bigger acid job." He stated Kachina's
proposed operation "was different from [Anchor's] actual operation," and the two could not properly
be described as "identical." William Newberry, Kachina's former officer, testified that Kachina
intended to restore the well to reasonable production while a horizontal well was arranged. Kachina
did not intend to perforate the well in a new zone, as done by Anchor. The evidence establishes that
Kachina's AFE did not cover Anchor's activities because they were substantially different from the
workover proposed by Kachina.

 Stable suggests these divergences are insignificant because the operator may
substantially exceed the estimate made in an AFE. Stable relies on the testimony of Newberry, who
admitted that Kachina could have exceeded the cost estimated by the AFE in an emergency. Yet the
rest of Newberry's testimony indicated that the operator usually cannot exceed an AFE without
permission. He explained that with "issues of significance we would have . . . needed additional
approval from the participants short of an emergency." He explained that with "a long weekly
fishing job, spending thousands" beyond the AFE, he "would stop and get approval." 

 Indeed, if non-consenting parties are going to forfeit their interests, it is essential that
the operation triggering that forfeiture is the same one the parties rejected. The evidence here is
factually and legally sufficient to establish that Anchor's project differed substantially from
Kachina's proposal. Because Anchor's operations differed from those proposed by Kachina, actual
commencement of Kachina's AFE never occurred, and the JOA relinquishment clause was not
triggered. This alone was enough to prevent Stable from gaining a majority interest.


 2. Operator Status

 Second, legitimate commencement of the AFE must be executed by the duly elected
operator. Only the operator has the power to perform such operations on behalf of the owners. 
Article VI.B. of the JOA requires that the "[o]perator shall perform all work for the account of the
Consenting Parties." Article V.A. provides that the operator shall have full control of all operations. 

 Stable argues that the trial court erred in holding that Anchor was not the legal
operator. Stable emphasizes that, although Kachina was acting as operator, it did not own a working
interest in the well as the JOA requires of the operator. Therefore, the owners of the well could
replace Kachina with a successor operator by majority vote. Anchor and Stable contend that together
they were able to constitute that majority vote and elect a successor operator. They assert that Stable
gained a majority working interest in the well by transferring funds for the non-consent interest. This
would have brought Stable's interests to approximately sixty-one percent. Stable contends that on
November 2, 1992, Stable assigned a one percent interest in the well to Anchor. This made Anchor
eligible to become the operator in accordance with the JOA's requirement that the operator own a
working interest. Acting on the assumption that together they constituted a sixty-one percent
majority, Stable and Anchor voted to remove Kachina and substitute Anchor as operator. That same
day, Anchor seized the well. In essence, Stable and Anchor argue that their possession of a majority
interest, in combination with Kachina's questionable status as operator, enabled them to elect Anchor
as the successor operator. 

 Stable correctly contends that Kachina was vulnerable to being replaced by a
successor operator because, at the time of Anchor's alleged election, Kachina did not own a working
interest in the well. The JOA provides that operators "shall be selected from the parties owning an
interest in the Contract Area." Because Kachina was not a partial owner, Article V.B.1 of the JOA
would have allowed the parties to replace Kachina with a successor operator: "If Operator . . . no
longer owns an interest in the Contract Area . . . it shall cease to be Operator without any action by
Non-Operator, except the selection of a successor." (Emphasis added.)

 Whether Anchor and Stable could have executed such a selection is governed by
Article VI.B.2, which provides that "the successor Operator shall be selected by the affirmative vote
of two (2) or more parties owning a majority interest based on ownership." This provision requires
that Anchor and Stable owned a majority interest in the well prior to electing Anchor as the
successor. However, they did not own a majority interest; they owned only thirty-three percent. 
Stable could not have acquired the additional interests until after commencement of operations, as
required by the JOA relinquishment clause. Yet Stable and Anchor claim that they elected Anchor
as operator prior to seizing the well and commencing operations. For that reason, the election of
Anchor was ineffective. Any vulnerability in Kachina's position was immaterial because Stable and
Anchor did not have the majority interest required to elect a successor without the consent of the
other parties. (3)

 Therefore, because the operations performed differed substantially and Anchor was
not the lawful operator, activities performed by Anchor did not constitute a legitimate
commencement of the operations proposed by Kachina's AFE. As a result, the non-consent interests
were never relinquished and could not be acquired by Stable. Thus, we conclude that Stable failed
to prove it acquired a majority interest, the court's ruling that Anchor was not the lawful operator
is correct.


 3. Stable's Alternative Theories

 Although Stable did not acquire owner/operator status pursuant to the JOA, Stable
also offers alternative theories of recovery. Stable points to a letter it received from Kachina
regarding the non-consent interests. The letter advised Stable that "Kachina must receive [Stable's]
payment of $4478.21 for its part of the non-consent interest in the Triangle K #1 workover. 
[Stable's] payment of $4478.21 will earn it an additional .2798881 interest in this well." Stable
argues that this letter created some entitlement to recovery because it contains an assurance that
Stable would acquire the interests. 

 Stable suggests that this letter is a basis for estoppel regarding application of its
check. Stable argues that not only did Kachina promise in the letter to apply any funds to the non-consent interests, but it also deposited the check from Stable, which was limited to that purpose per
a written condition. Stable argues that estoppel therefore prevents Kachina from claiming to have
applied the money otherwise. However, the funds from Stable were never applied toward the non-consent interests. Kachina initially retained the funds in an escrow account. Early in the suit, the
trial court appointed a master to review the accounting of the parties. Pursuant to the master's
recommendation, the court ordered that the funds be applied toward Stable's delinquent joint interest
billings. Therefore, Stable's estoppel theory fails because the funds were applied to Stable's past-due indebtedness by court order and not as a result of Kachina's conduct. (4)

 Nor does Kachina's letter confer upon Stable any rights to the non-participants'
ownership interests. Even if we interpret the letter as promising relinquishment upon payment, that
promise would have conflicted with the JOA's "upon commencement" clause. Any modification
attempted by Kachina and Stable to the relinquishment clause of the JOA would not have been
binding without the consent of the other parties to the contract. See Hathaway v. General Mills, Inc.,
711 S.W.2d 227, 228-29 (Tex. 1986). The record contains legally and factually sufficient evidence
from which the trial court could conclude that Stable failed to prove it acquired a majority interest
or that Anchor was the legal operator. We overrule Stable's first point of error.


Reimbursement for Workover Costs

 Stable also argues that the trial court erred in refusing to reimburse it for the $33,500
Anchor spent reworking well. To recover this expenditure under the JOA, Stable was required to
comply with its terms. The JOA, however, only provides reimbursement for workover costs to the
operator. Under Article V.A., the operator "has full control of all operations." The operator alone
is entitled to perform operations on behalf of the consenting parties and bill them accordingly. The
JOA also requires, under Article VI.B., that any projects undertaken by the operator be preceded by
an AFE soliciting participation of the owners. Under the second paragraph of the "Accounting
Procedure," an attachment to the JOA, the operator must send monthly joint interest billings to keep
the owners abreast of costs. Thus, to recover under the JOA, Anchor was required to be the
legitimate operator, obtain approval from the other parties, and send monthly joint interest billings. 
Anchor did not comply with these requirements. As previously discussed, Anchor was never the
duly elected operator under the terms of the JOA. In addition, Anchor did not request the approval
of the parties with an AFE proposing its specific operations. The AFE sent by Kachina did not
transfer to Anchor's project because the two types of workovers differed significantly. Finally,
Anchor also failed to provide monthly joint interest billings to inform the owners of costs. The
activities performed by Anchor do not satisfy the JOA's provisions for reimbursement to the
operator.

 Although Stable did not establish its right to reimbursement under the JOA, it alludes
to other theories of reimbursement as well. Stable suggests recovery under quantum meruit by
arguing that it conferred a benefit to the other owners when Anchor conducted the workover. To
establish a claim under quantum meruit, Stable must establish that (1) it rendered a valuable service
to the owners of the well, (2) the owners accepted and benefitted from the workover, and (3) the
owners reasonably would have known that Stable expected payment. See Sourignavong v. Methodist
Healthcare Sys. of San Antonio, Ltd., 977 S.W.2d 382, 385 (Tex. App.--Amarillo 1998, pet. denied)
(citing Bashara v. Baptist Mem'l Hosp. Sys., 685 S.W.2d 307, 310 (Tex. 1985)). Stable claims that
production resumed after the workover, but fails to present evidence regarding the reasonable value
of the benefit allegedly received by the owners. Thus, Stable has not pled or proven the elements
of quantum meruit.

 Stable also suggests it deserves reimbursement under a theory of promissory estoppel. 
Stable urges that Kachina represented in its letter that Stable's payment would acquire the non-consent interests. Stable alleges that the letter induced Stable to rely on the letter to Stable's
detriment.

 To enforce a representation by promissory estoppel, the first requisite is an actual
promise. See Aubrey v. Workman, 384 S.W.2d 389, 393 (Tex. Civ. App.--Fort Worth 1964, writ
ref'd n.r.e). Although the letter represents that Stable's payment will acquire the additional interests,
it does not promise that transfer of interests will occur upon tender of payment. The JOA specifies
that relinquishment occurs upon commencement of the project. Kachina's letter can reasonably be
construed as consistent with the JOA, truthfully predicting that Stable would acquire the interests
if the proposed workover went forward.

 Regardless, no estoppel arises if Stable was as well informed as Kachina regarding
the relinquishment of non-consent interests. See Barfield v. Howard M. Smith Co., 426 S.W.2d 834,
838-39 (Tex. 1968). Anchor was a party to the JOA and had a duty to be familiar with its terms,
including the relinquishment clause. See Farina v. Calvary Hill Cemetery, 566 S.W.2d 650, 652
(Tex. Civ. App.--Texarkana 1978, writ ref'd n.r.e.). If an alleged promise is part of a valid contract,
the promisee cannot disregard the contract and sue for reliance damages under the doctrine of
promissory estoppel. Guaranty Bank v. Lone Star Life Ins. Co., 568 S.W.2d 431, 434 (Tex. Civ.
App.--Dallas 1978, writ ref'd n.r.e.). Stable has not pled or proven the elements of promissory
estoppel.

 Legally and factually sufficient evidence supports the trial court's denial of
reimbursement. Compensation is not justified under the JOA or any other theory relied upon by
Stable. We overrule Stable's second point of error on the reimbursement of workover costs. 
Because all of the rulings were supported by sufficient evidence, we also overrule Stable's third
point of error.


Attorney's Fees

 Stable argues that this Court should reverse the award to Kachina for attorney's fees
if it reverses the trial court's declaratory judgment. However, in light of our affirmance, we conclude
the award to Kachina for attorney's fees was reasonable. The Texas Uniform Declaratory Judgments
Act provides: "In any proceeding under this chapter, the court may award costs and reasonable and
necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009
(West 1997). "The granting or denial of attorney's fees in a declaratory judgment action is within
the trial court's discretion." Barshop v. Medina County Underground Water Conservation Dist., 925
S.W.2d 618, 637 (Tex. 1996). Both the award to Kachina and the denial of an award to Stable for
attorney's fees were within the discretion of the trial court. We overrule points of error four and five.


CONCLUSION

 Having overruled all of Stable's points of error, we affirm the trial court's judgment
in all respects.



 

 Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed

Filed: June 29, 2001

Publish

1. Both Stable Energy and its predecessor, Pampell Interests, will be referred to as "Stable."
2. Anchor Operating Co. & Stable Energy, L.P. v. Kachina Oil & Gas, Inc., No. 03-94-00254-CV
(Tex. App.--Austin June 21, 1995, no writ) (not designated for publication).
3. Kachina also argues that, even if Stable had acquired a majority interest in the well, the non-consenting parties retained a right to vote on the succession of the operator. Hill v. Heritage Res.,
Inc., 964 S.W.2d 89, 111 (Tex. App.--El Paso 1997, pet. denied). Because we affirm the trial
court's judgment on other grounds, we need not address this issue.
4. Promissory estoppel as a general theory of recovery is discussed below.


et. denied)
(citing Bashara v. Baptist Mem'l Hosp. Sys., 685 S.W.2d 307, 310 (Tex. 1985)). Stable claims that
production resumed after the workover, but fails to present evidence regarding the reasonable value
of the benefit allegedly received by the owners. Thus, Stable has not pled or proven the elements
of quantum meruit.

 Stable also suggests it deserves reimbursement under a theory of promissory estoppel. 
Stable urges that Kachina represented in its letter that Stable's payment would acquire the non-consent interests. Stable alleges that the letter induced Stable to rely on the letter to Stable's
detriment.

 To enforce a representation by promissory estoppel, the first requisite is an actual
promise. See Aubrey v. Workman, 384 S.W.2d 389, 393 (Tex. Civ. App.--Fort Worth 1964, writ
ref'd n.r.e). Although the letter represents that Stable's payment will acquire the additional interests,
it does not promise that transfer of interests will occur upon tender of payment. The JOA specifies
that relinquishment occurs upon commencement of the project. Kachina's letter can reasonably be
construed as consistent with the JOA, truthfully predicting that Stable would acquire the interests
if the proposed workover went forward.

 Regardless, no estoppel arises if Stable was as well informed as Kachina regarding
the relinquishment of non-consent interests. See Barfield v. Howard M. Smith Co., 426 S.W.2d 834,
838-39 (Tex. 1968). Anchor was a party to the JOA and had a duty to be familiar with its terms,
including the relinquishment clause. See Farina v. Calvary Hill Cemetery, 566 S.W.2d 650, 652
(Tex. Civ. App.--Texarkana 1978, writ ref'd n.r.e.). If an alleged promise is part of a valid contract,
the promisee cannot disregard the contract and sue for reliance damages under the doctrine of
promissory estoppel. Guaranty Bank v. Lone Star Life Ins. Co., 568 S.W.2d 431, 434 (Tex. Civ.
App.--Dallas 1978, writ ref'd n.r.e.). Stable has not pled or proven the elements of promissory
estoppel.

 Legally and factually sufficient evidence supports the trial court's denial of
reimbursement. Compensation is not justified under the JOA or any other theory relied upon by
Stable. We overrule Stable's second point of error on the reimbursement of workover costs. 
Because all of the rulings were supported by sufficient evidence, we also overrule Stable's third
point of error.


Attorney's Fees

 Stable argues that this Court should reverse the award to Kachina for attorney's fees
if it reverses the trial court's declaratory judgment. However, in light of our affirmance, we conclude
the award to Kachina for attorney's fees was reasonable. The Texas Uniform Declaratory Judgments
Act provides: "In any proceeding under this chapter, the court may award costs and reasonable and
necessary attorney's fees as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009
(West 1997). "The granting or denial of attorney's fees in a declaratory judgment action is within
the trial court's discretion." Barshop v. Medina County Underground Water Conservation Dist., 925
S.W.2d 618, 637 (Tex. 1996). Both the award to Kachina and the denial of an award to Stable for
attorney's fees were within the discretion of the trial court. We overrule points of error four and five.


CONCLUSION

 Having overruled all of Stable's points of error, we affirm the trial court's judgment
in all respects.



 

 Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Puryear

Affirmed

Filed: June 29, 2001

Publish

1. Both Stable Energy and its predecessor, Pampell Interests, will be referred to as "Stable."
2. Anchor Operating Co. & Stable Energy, L.P. v. Kachina Oil & Gas, Inc., No. 03-94-00254-CV
(Tex.