TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN








NO. 03-04-00379-CV







Edwards Aquifer Authority; Gregory M. Ellis, General Manager of the Authority, in his
official capacity; and Carol Patterson, Michael Beldon, Levi Jackson, Rafael Zendejas,
Susan Hughes, Doug Miller, Ken Barnes, Bailey Barton, Hunter Schuehle, Luana

Buckner, Bruce Gilleland, Rogelio Munoz, George Rice, Johnny A. Rodriguez,

Jr., and Cheryl Gilpin, in their official capacities, Appellants



v.



Chemical Lime, Ltd., Appellee







FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT

NO. C2002-0547 A, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING





O P I N I O N



 In the 1993 Edwards Aquifer Authority (EAA) Act, the legislature established a new
regulatory scheme to govern use of groundwater from the aquifer and a new agency, appellant
Edwards Aquifer Authority (the Authority), to administer the regime. The legislature granted a
preference under the EAA Act's permitting regime to existing users of aquifer water. To obtain the
preference, the EAA Act provided that existing users had to file with the Authority a declaration of
historical use by March 1, 1994--exactly six months after the EAA Act's effective date. Intervening
legal developments barred implementation of the EAA Act until 1996, when the supreme court
rejected constitutional challenges to the EAA Act and vacated an injunction against its enforcement
in Barshop v. Medina County Underground Water District, 925 S.W.2d 618 (Tex. 1996). In lieu
of the then-expired 1994 statutory deadline, the Authority, relying on an interpretation of Barshop,
set by rule a deadline of December 30, 1996--six months after the Barshop opinion was issued--for
existing users to file declarations of historical use. Appellee Chemical Lime, Ltd., whose New
Braunfels plant had used aquifer water since the early 1900s, filed its declaration on January 17,
1997. Over three years later, the Authority rejected Chemical Lime's declaration for being untimely
filed, thereby depriving Chemical Lime of preference as an existing user. 

 Chemical Lime sought a declaration in district court that the Authority's filing
deadline rule was not authorized by the EAA Act and Barshop, and, in the alternative, that Chemical
Lime had substantially complied with the filing requirements. The district court rendered judgment
invalidating the rule and declared both that Chemical Lime's declaration had been timely filed as a
matter of law and that Chemical Lime had substantially complied with the filing requirements even
if the Authority's deadline was proper. It also awarded Chemical Lime attorney's fees. The
Authority appeals this judgment. 

 Barshop compels us to reverse the district court's judgment invalidating the
Authority's filing deadline rule and render judgment that Chemical Lime's filing was untimely as
a matter of law. Under these circumstances, moreover, we are required to render judgment awarding
the Authority its attorney's fees. 


BACKGROUND

 As its name suggests, Chemical Lime produces lime, a product used in road
construction, steel manufacture, water treatment, and the removal of sulfur compounds from
emissions from coal-fired plants. (1) In 1999, Chemical Lime bought APG Lime, including a lime-production plant in New Braunfels. This plant, in operation since 1907, uses water for lime
processing, dust suppression, the cooling of equipment, drinking water, and sanitation. The plant's
sole water source is well water from the Edwards Aquifer, an underground system of water-bearing
formations that includes all or parts of Atascosa, Bexar, Caldwell, Comal, Guadalupe, Hays, Medina,
and Uvalde counties. See Barshop, 925 S.W.2d at 624-25. 

 The Edwards Aquifer Authority is a conservation and reclamation district created by
the legislature in 1993 and empowered to regulate groundwater withdrawals by well from the
aquifer. See Act of May 30, 1993, 73d Leg., R.S., ch. 626, §§ 1.02, 1.14, 1.41, 1993 Tex. Gen. Laws 
2350, 2350-2372 (EAA Act); see Tex. Const. art. XVI, § 59(a). Because this appeal concerns
procedural requirements relating to the Authority's regulation of the aquifer, it is helpful first to
examine these requirements--and various legal developments that ultimately delayed their effect--in
order to place the Authority's appellate issues in context.


The Edwards Aquifer Authority Act

 Among other limitations, the EAA Act imposed aquifer-wide limits on water
withdrawals by non-exempt wells and empowered the Authority to allocate the caps among wells
through a permit system. (2)
 EAA Act § 1.14(b) & (c). The legislature gave "existing users"
preference under the permit system. See id. § 1.16. "Existing users" were defined as persons who
withdrew and beneficially used underground water from the aquifer on or before June 1, 1993. Id. 
§ 1.03(10). "An existing user may apply for an initial regular permit by filing a declaration of
historical use of underground water withdrawn from the aquifer during the historical period from
June 1, 1972, through May 31, 1993." Id. § 1.16(a). The Authority was authorized initially to grant
regular permits solely to existing users who properly filed a declaration of historical use and who
established "by convincing evidence beneficial use of underground water from the aquifer." Id.
§ 1.16(d). Existing users were entitled to an amount of water equal to their maximum beneficial use
of water during any one calendar year of the historical period unless the total amount of such
maximums by all existing users in the aquifer exceeded 450,000 acre-feet per year through the year
2007 and 400,000 acre-feet per year thereafter. Id. §§ 1.14(b), (c), 1.16(e). If total maximum
historical usage exceeded this level, the legislature required the Authority to reduce proportionately
the amounts of withdrawals under the permits as necessary to meet the cap. Id. § 1.16(e). 
Conversely, to the extent that unallocated water within the cap remained after the issuance of permits
to existing users who properly applied, the Authority was authorized to issue additional regular
permits, subject to the cap. Id. § 1.18(a). 

 As originally enacted, the EAA Act required existing users to file their "declaration
of historical use" on or before March 1, 1994. Id. § 1.16(b). This date was exactly six months after
the original effective date of the EAA Act, September 1, 1993. See id. § 4.02. Until the Authority
actually began granting regular permits, existing users could continue to beneficially withdraw and
beneficially use water, provided it was not wasted. Id. § 1.17. 


The Barshop litigation and other delays

 The EAA Act also provided that the Authority's board of directors would be
appointed by various governing bodies affected by the Authority. Id. § 1.09. This appointment
procedure was required to be submitted to the United States Department of Justice for administrative
preclearance under section 5 of the Voting Rights Act. See 42 U.S.C.A. § 1973c (West 2003). The
Department refused preclearance on the basis that the EAA Act contemplated appointive rather than
elective selection of the Authority's board. This made the appointment provision unenforceable. 
See id. The legislature did not attempt to remedy the EAA Act's section 5 problem until its next
regular session in 1995. Thus, the EAA Act's original September 1, 1993 effective date and its
March 1, 1994 deadline for existing users to file declarations of historical use both passed during a
period in which the EAA Act was made unenforceable by federal law. 

 In 1995, the legislature amended the EAA Act to change the board's selection method
from appointment to election. Act of May 29, 1995, 74th Leg., R.S., ch. 261, § 1, 1995 Tex. Gen.
Laws 2505, 2505-17 (amendments to the EAA Act). (3) The legislature provided that these
amendments would take effect on August 28, 1995, and the Department of Justice precleared the
amended EAA. Id. at 2517; Barshop, 925 S.W.2d at 625. However, the legislature did not amend
the EAA Act's original March 1, 1994 historical use declarations filing deadline or otherwise address
how this expired deadline was to be adjusted. 

 Six days before the amendments to the EAA Act were to take effect, a group of local
underground water conservation districts and agricultural interests brought a constitutional challenge
to the EAA Act in the district court of Medina County and sought to restrain its administration and
enforcement. The district court held the EAA Act unconstitutional and enjoined the State from
enforcing it. Barshop, 925 S.W.2d at 625. The effective date of the EAA Act, as amended, passed
while the State was enjoined from enforcing it. On direct appeal, the Texas Supreme Court, in an
opinion issued on June 28, 1996, found the EAA Act constitutional, dissolved the district court's
injunction, and remanded for consideration of the State's entitlement to attorney's fees. Id. at 637-38. 

 The supreme court in Barshop rejected the plaintiffs' argument that the EAA Act
effected an unconstitutional taking of existing users' property rights by imposing a then-impossible
March 1, 1994 deadline to file the historical use declaration. Id. at 628. Eschewing a literal
interpretation of the deadline provision, the supreme court construed it as merely "directory" rather
than "mandatory." Id. at 628-30. The statutory deadline, in other words, merely manifested the
broader legislative intent "that declarations of historical use [are] to be filed six months after the
Authority becomes effective." Id. at 630. The court explained that the legislature "obviously
intended that existing users would have preference over future users" and thus "provided existing
users the opportunity to file their declarations with the Authority after the effective date of the Act
but before allocation of water to other potential users." Id. at 629. Having construed the statutory
deadline to provide existing users an opportunity to file historical use declarations, the supreme court
held that the EAA Act did not effect a taking. Id. at 630.

 The supreme court denied rehearing of its judgment on August 16, 1996. 


The Authority responds to Barshop

 In the aftermath of Barshop, the Authority promulgated rules setting forth the
procedures governing the filing of declarations of historical use. (4) See 21 Tex. Reg. 11377, 11377-84
(1996) (codified at 31 Tex. Admin. Code §§ 701.1-.5, .11-.13, .15-.19, .21-.22) (adopted Nov. 22,
1996). The Authority published proposed rules on September 3, 1996, id. at 13784, and final rules
on October 31, 1996, with an effective date of November 21, 1996. Id. The proposed rule set a
deadline of December 28, 1996, a Saturday, for existing users to file their declarations of historical
use. Id. at 11382. The Authority chose that date based on its interpretation of Barshop. Id. at
11378. It understood the supreme court to hold that the deadline for existing users to file
declarations of historical use would be six months after the date the EAA Act had become "fully
effective." Id. The Authority concluded that the EAA Act became effective on June 28, 1996, the
same date the supreme court issued the Barshop opinion. It reasoned that the implementation of the
amended EAA Act had been suspended by a district court injunction but that the "injunction was
dissolved by the Texas Supreme Court on June 28, 1996, and the Act thereby became effective on
that date." Id.

 In response to comments, the Authority moved the deadline to December 30, the first
Monday following the 28th, to address concerns that its offices otherwise would have been closed
on the Saturday deadline. Id. at 11381. Foreshadowing the issues in this appeal, the Authority
rejected arguments that the deadline should be based not on the date the Barshop opinion was issued
but on subsequent events in the appeal: 


A commentator contended that the filing date should be February 28, 1997, which is
six months after the date the Texas Supreme Court issued its mandate on August 31,
1996 in Barshop . . . sending the case back to the trial court. The filing date stated
in the rule is December 30, 1996, six months after the Texas Supreme Court
dissolved the trial court injunction that had blocked the Act from taking effect. The
staff adheres to the December date, because the Act became fully effective on June
28, 1996, when the injunction was dissolved. The dissolution of the injunction was
immediately effective, and was not delayed by subsequent procedural steps in the
Supreme Court. The staff recommends against adopting the February date because
it is inconsistent with the Legislature's intent to require filing of declarations of
historical use six months after the actual effective date of the Act. Adopting the later
date would also expose those applications who would file after December 30, 1996,
to litigation attacking the filings as untimely. 



Id. 



Chemical Lime files its permit application

 From at least 1992, the New Braunfels plant now owned by Chemical Lime had been
reporting its monthly water usage to the Texas Natural Resource Conservation Commission
(TNRCC). (5) In November 1996, John Kret, the plant manager, received by mail an "Application for
Initial Regular Permit and Declaration of Historical Use" from the Authority. Kret gave the form
to Jim Johnson, the plant manager, to complete and file with the Authority. Because Johnson
thought that the information requested was similar to the information Chemical Lime had previously
been required to file with the TNRCC, which was also due at the end of the year, Johnson decided
to fill out both forms at the same time. Only later did Johnson discern that the Authority was
requesting twenty-one years of back data; the TNRCC required only one year of data. Johnson
testified that, in mid-December 1996, he called the Authority to inquire if they needed "good" data
or if he could provide estimates. He could not remember the name of the person with whom he
spoke, but he claimed that he identified himself to an Authority employee, who informed him that
the Authority needed actual data from all years in the twenty-one year period, not estimates. 

 Johnson then attempted to recover the data requested but was unable to find all the
records for the years requested. Sometime between December 25 and December 30, he again called
the Authority. He testified that he spoke with Gayle Kipp (6) and told her that he would not be able to
submit a complete application by December 30 unless he was able to supply estimated data for some
years. He testified that Kipp told him to "get it in when you get it--when you get that data on it." 
According to Kipp's testimony, Authority staff had instead been instructed that the applications
could be submitted without complete water use data and that data could be filed after the deadline. (7) 
Johnson filed the application with the Authority on January 17, 1997. It was incomplete because he
was not able to find data for all of the requested years. 

 In February 1997, the Authority sent Chemical Lime a letter "acknowledg[ing] the
receipt of your application for initial regular permit." It also stated that Chemical Lime's
"application is administratively complete during the initial administrative review process." The
Authority began processing applications sometime in March. Kipp conducted a field inspection of
the New Braunfels facility in June. In December, the Authority advised Chemical Lime that it
"preliminarily found that your application provides sufficient convincing evidence to substantiate
your declaration of historical use." It determined an amount of Chemical Lime's "maximum
beneficial use of water without waste" and stated that Authority staff "will be recommending that
you receive a permit according to your application." In April 1998, the Authority notified Chemical
Lime that "the technical review of the application was completed on 3/21/98," and, on April 24, it
issued Chemical Lime an "Initial Regular Permit" to withdraw water from the Aquifer, "subject to
final action of the Board of Directors of the Authority." Thus, Chemical Lime was still not yet
entitled to begin withdrawing water under a permit. At the Authority's request, Chemical Lime
provided further information in support of its application in May 2000. 

 In November 2000, the Authority rejected Chemical Lime's application, finding that
its declaration of historical use was not filed timely (before December 30, 1996) (8) and that its
historical withdrawals were not placed to a beneficial use for irrigation, municipal, or industrial use. 
Chemical Lime then filed its notice of protest in December. Several Chemical Lime employees met
with Walthour in January 2001 to discuss the rejection of the application. Walthour told them that
they would need to schedule an "informal meeting," which was later set for October 2001. The
Authority also sent Chemical Lime a letter in May, scheduling an "informal meeting" in October as
"an opportunity to provide evidence to support their protest." The Authority staff attorney with
whom they met in October stated that he did not have authority to make decisions concerning
applications, and so another meeting was scheduled with Gregory Ellis, the General Manager of the
Authority, for later in the month. At that meeting, Ellis requested more information in support of
Chemical Lime's application, which Chemical Lime filed with the Authority in December 2001. In
May 2002, Ellis rejected Chemical Lime's requests. 


Proceedings below

 Chemical Lime filed suit in district court seeking declarations that: (1) the Authority's
rule establishing a December 30, 1996 filing deadline was invalid and that Chemical Lime's initial
regular permit application was filed timely on January 17, 1997; (2) the EAA Act--specifically, the
legislature's repeal of section 1.11(h) of the EAA Act, which had made the EAA subject to the
Administrative Procedures Act--violates constitutional protections of due course of law, separation
of powers, open courts and jury trial because it affords inadequate judicial review of EAA
determinations; (9) (3) the EAA's "unlawful actions" effected an unconstitutional taking; and (4) in the
alternative, assuming that the EAA's December 30, 1996 filing deadline was valid, Chemical Lime
had substantially complied with it. See Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West
1997 & Supp. 2004-05). The district court severed the takings claim. The deadline validity issue
and remaining constitutional claims were tried to the district court on stipulated facts. The
substantial-compliance issue was tried to a jury, which found in Chemical Lime's favor. The district
court rendered judgment that the Authority's December 30, 1996 deadline was invalid and Chemical
Lime's IRP application was timely filed. It held in the alternative that Chemical Lime had
substantially complied with the application requirements and that "the Authority's denial of
Chemical Lime's IRP application on the grounds that it was not timely is invalid, improper, and
illegal." However, the district court rendered judgment that the legislature's repeal of section 1.11(h)
did not violate the constitutional protections of due course of law, separation of powers, open courts,
and jury trial. Finally, the district court awarded Chemical Lime attorney's fees and costs, and later
made findings of fact and conclusions of law regarding this portion of the judgment. This appeal
followed. 




DISCUSSION


 The Authority presents four issues on appeal. It first contends that the district court
erred in invalidating the Authority's rule setting December 30, 1996 deadline for filing declarations
of historical use. It urges that the effective date of the EAA Act was June 28, 1996, the date Barshop
was decided, and that Barshop and the legislative intent underlying the EAA Act compelled the
agency to set its deadline, December 30, the first business day following six months after the date
Barshop issued. The Authority next challenges the district court's alternative holding that Chemical
Lime substantially complied with a December 30 deadline. In its second issue, the Authority
contends that, as a matter of law, a party cannot be in "substantial compliance" with a filing deadline
when there is no dispute that the party failed to file any portion of the filing until after that deadline. 
Predicated on this argument, the Authority asserts in its third point that there is no evidence that
Chemical Lime substantially complied with the December 30, 1996 deadline. 

 In its fourth issue, the Authority presents two arguments challenging the district
court's award of attorney's fees. It begins with the assertion that Chemical Lime cannot recover
attorney's fees under the UDJA because the water code provides Chemical Lime with its exclusive
remedies and does not provide for attorney's fees. See Tex. Water Code Ann. §§ 36.251-.254 (West
2000); Hageman v. Luth, 150 S.W.3d 617, 627 (Tex. App.--Austin 2004, no pet.); Strayhorn v.
Raytheon E-Systems, Inc., 101 S.W.3d 558, 572 (Tex. App.--Austin 2003, pet. denied); Young
Chevrolet v. Texas Motor Vehicle Bd., 974 S.W.2d 906, 911 (Tex. App.--Austin 1998, pet. denied). 
Second, the Authority asserts that, if it prevails on the merits of its first three issues, an award of
attorney's fees to the Authority is mandatory. See Tex. Water Code Ann. § 36.066(g) (West Supp.
2005). 


Barshop and the deadline for filing a declaration of historical use

 In its first issue, the Authority asserts that its December 30, 1996 historical use
declaration filing deadline is authorized under the EAA Act, as construed in Barshop. This issue
presents pure questions of law, which we review de novo. (10) See In re Entergy Corp., 142 S.W.3d
316, 322 (Tex. 2004); In re Humphreys, 880 S.W.2d 402, 404 (Tex. 1994). 

 The Authority's argument rests upon two subsidiary propositions. First, the Authority
interprets Barshop to hold that the historical use declaration filing deadline is six months after the
EAA Act's effective date. Second, the Authority contends that the EAA Act's effective date was
June 28, 1996, at the moment when the supreme court issued its Barshop opinion dissolving the
injunction barring implementation of the EAA Act. Therefore, the Authority concludes, its rule
setting a filing deadline of December 30, 1996 is within its statutory powers, (11) and Chemical Lime's
January 17, 1997 filing is untimely as a matter of law. 

 Chemical Lime does not dispute the Authority's view that Barshop fixes the filing
deadline at six months after the EAA Act's effective date but differs as to when the effective date
was. Chemical Lime argued in its brief that the EAA Act did not become effective until at least
August 16, 1996, the date the supreme court denied rehearing in Barshop, because the ruling
dissolving the injunction was not final until that date. During oral argument, Chemical Lime
suggested that the date the supreme court issued its mandate in Barshop--August 31, 1996--might
also control. Six months after these dates would have been February 16, 1997 or February 28,
respectively. (12) In either case, the Authority's rule setting an earlier deadline would have been
invalid, and Chemical Lime's filing would have been timely.


 When the EAA Act became enforceable

 While both parties (and even the supreme court in Barshop) suggest that the EAA
Act's "effective date" had been postponed by the section 5 preclearance problems and the Barshop
injunction, that did not occur in a literal sense. Inasmuch as a court's enjoining of a statute only
delays its enforcement and does not alter its effectiveness, the effect of the section 5 delays and the
district court injunction also could only bar implementation and enforcement of the EAA Act once
it took effect, not change the date the legislature specified for the EAA Act to take effect. See Texas
Highway Comm'n v. West Tex. Drilling, Inc., 366 S.W.2d 242, 244 (Tex. Civ. App.--Austin 1963,
writ ref'd n.r.e.) (injunction prevents enforcement of statute); see also Tex. Const. art I, § 28
(suspension of law only within power of legislature); 42 U.S.C.A. § 1973c. Stated another way, the
EAA Act took effect in 1993, but its implementation and enforcement were barred by section 5 of
the voting rights act. See 42 U.S.C.A. § 1973c. Subsequently, the legislature amended the EAA Act
to address the preclearance issues and made this new version effective on August 28, 1995. Act of
May 29, 1995, 74th Leg., R.S., ch. 261, § 1, 1995 Tex. Gen. Laws 2505, 2517. Prior to that date,
the Barshop district court enjoined the amended EAA Act's implementation and enforcement. The
amended EAA Act took effect while this injunction remained in effect. Considering the context, we
believe that the supreme court in Barshop used such terms as "effective date" and "date the
Authority becomes effective" not in their literal sense but as shorthand references to the date on
which the legal impediments to the EAA Act's implementation and enforcement were finally
removed. 

 We agree with the Authority that the EAA Act became enforceable on June 28, 1996,
when the supreme court issued its Barshop opinion dissolving the district court's injunction barring
the EAA Act's implementation and enforcement. In making this determination, we are guided by
a decision of the Texas Supreme Court in Flanary v. Wade, 113 S.W. 8 (Tex. 1908). In that land
title suit, the supreme court was required to determine who was entitled to a particular tract of land
that had been sold under execution as a result of a previous suit. Id. at 9. In the earlier suit, the
district court had held in favor of the plaintiff, but the court of civil appeals, in a decision rendered
April 18, 1903, had ordered that the judgment of the district court be reversed and the cause
remanded unless the appellee filed a remittitur within twenty days. Id. A remittitur was timely filed,
and on May 9, 1903 the appellate court ordered that the judgment be affirmed in the original amount
without the remittitur. Id. The plaintiff in the district court caused a writ of execution to be issued
on April 28, 1903, and on May 8 the writ was levied on the land of the defendant. Id. The land was
sold under this execution on July 7. Id. The supreme court held that the execution had been issued
on a judgment that was then annulled by the court of civil appeals. Id. at 9-10. For this reason, the
court held that the sale of the land was void and conferred no title upon the buyer, or his assignee
who was a party to the land title suit, notwithstanding that the judgment had been affirmed when the
sale took place. Id. at 10. The court reasoned: 


On the 28th day of April, 1903, there was no judgment in the District Court of
Bosque County between the parties hereto which would authorize the issuance of the
execution that the clerk of that court issued directed to the sheriff of Erath County;
therefore the execution issued upon the judgment which had been annulled by the
Court of Civil Appeals, being without authority, was void, and the levy made by
virtue of that execution upon the land in controversy on the 8th day of May was
likewise invalid. It follows that, the execution and the levy upon which the
subsequent proceeding and sale depended being invalid, the sale itself was void and
conferred no title upon Wood who purchased at the sale made on July 17, 1903. The
title of Wade being derived from Wood, necessarily falls with it, and the conclusion
must be reached that Wade had no cause of action in this case for the recovery of this
land. 


 The subsequent affirmance of the judgment of the District Court of Bosque
County by the Court of Civil Appeals was in fact the entering of a new and different
judgment, but in no phase of the case could the subsequent entry of the judgment
have the effect to make valid that which was void before.



Id. In short, the supreme court held that the judgment of the court of civil appeals was immediately
effective to set aside the trial court's judgment and render it inoperative, despite the fact that the
judgment of the court of civil appeals was still subject to being set aside by the court of civil appeals
itself or by the supreme court and that no mandate had issued. See also Humble Exploration Co. v.
Walker, 641 S.W.2d 941, 943 (Tex. App.--Dallas 1982, orig. proceeding) (appellate court order
vacating receivership operated instantly; therefore, trial court was without jurisdiction to continue
receivership). 

 More recently, in a case concerning a post-judgment garnishment, the Fifth Circuit
recognized Flanary's continuing vitality in Texas law. See In re Bohart, 743 F.2d 313, 319-21 (5th
Cir. 1984). Bohart concerned, in part, a post-judgment writ of garnishment that had been entered
against Bohart by a Texas district court, which the Dallas court of civil appeals had reversed. (13) Id.
at 316. In particular, it noted that "a reversal by the Court of Civil Appeals results in the immediate
suspension of the judgment of the district court. This is so even though the mandate has not issued
in the case and there is a petition for writ of error pending." In re Bohart, 743 F.2d at 321. 

 In still more recent times, the supreme court has emphasized the significance of the
mandate in determining when an appellate court judgment becomes enforceable in a lower court. 
The mandate is the formal command from an appellate court commanding the lower court to comply
with the appellate court's judgment. See Tex. R. App. P. 51.1(b), 65.2; In re Grossnickle, 115
S.W.3d 238, 243 (Tex. App.--Texarkana 2003, orig. proceeding); Lewelling v. Bosworth, 840
S.W.2d 640, 642-43 (Tex. App.--Dallas 1992, orig. proceeding); Dixie Gas & Fuel Co. v. Jacobs,
66 S.W.2d 446, 448 (Tex. Civ. App.--Beaumont 1933, writ dism'd w.o.j.) (citing Black v.
Epperson, 40 Tex. 162, 172-73 (Tex. 1874)). A trial court cannot enforce a judgment of an appellate
court before mandate issues. See In re Long, 984 S.W.2d 623, 625-26 (Tex. 1999); see also Stacy
Obenhaus, It Ain't Over 'Til It's Over: The Appellate Mandate in Texas Courts, 15 The Appellate
Advocate: State Bar of Texas Appellate Section Report 4, 5-8 (2003). In Long, for example, the
district clerk had been enjoined by the district court from collecting certain filing fees and appealed
that injunction. Long, 984 S.W.2d at 624. The district court later found the clerk in contempt for
violating the injunction and issued fines, and the clerk appealed. Id. The supreme court noted that
the clerk's original notice of appeal had functioned as a supersedeas bond. Id. at 626. It then held
that "the Clerk could not be held in contempt for violating the injunction until all appeals relating
to the judgment were exhausted and a mandate enforcing the injunction was issued." Id.; see also
Saudi v. Brieven, 176 S.W.3d 108, 2004 Tex. App. LEXIS 9595, at *17 (Tex. App.--Houston [1st
Dist.] 2004, pet. denied). 

 In this case, we are not concerned with the enforceability of an appellate judgment
in the trial court, as in Long, but with the enforceability of a lower court judgment once an appellate
court reverses it. As in Flanary, the supreme court's opinion in Barshop was immediately effective
to set aside the trial court's injunction, rendering it inoperative. 

 In response, Chemical Lime argues that the EAA Act could not have become
enforceable until August 16, 1996, the date the supreme court denied the motion for rehearing in
Barshop. See Ranger Ins. Co. v. Robertson, 680 S.W.2d 618, 621 (Tex. App.--Austin 1985)
(district court had no jurisdiction to render consent judgment on parties' settlement agreement
entered into after supreme court announced its opinion but while motion for rehearing was pending),
aff'd in relevant part, Robertson v. Ranger Ins. Co., 689 S.W.2d 209 (Tex. 1985); Brown v.
Linkenhoger, 153 S.W.2d 342, 343 (Tex. Civ. App.--El Paso 1941, writ ref'd w.o.m.) (supreme
court's judgment not final until court has acted on motion for rehearing; deadline for issuing mandate
calculated from action on motion for rehearing, not from issuance of opinion). However, the fact
that the supreme court retained jurisdiction until August 16 to alter its disposition of the district
court's judgment--and could have, but did not do so--presented no barrier to the implementation
and enforcement of the EAA Act. Once the supreme court vacated the district court's injunction on
June 28,1996, the EAA Act immediately could be implemented and enforced unless and until the
supreme court ordered otherwise. See In re Bohart, 743 F.2d at 321; Flanary, 113 S.W. at 10.


 When the six-month filing period was triggered

 Both parties construe Barshop to set the historical use designation filing deadline as
six months after the EAA's "effective date" (i.e., the date the EAA Act became enforceable). The 
Barshop court does ultimately conclude that "we interpret the Act as requiring declarations of
historical use to be filed six months after the Authority becomes effective." Barshop, 925 S.W.2d
at 630. As an intermediate appellate court, we are bound to follow this holding and agree with the
Authority that its rule setting a deadline of December 30, 1996--the first weekday following six
months after the date the EAA Act became enforceable--was within its powers. However, our
examination of Barshop causes us to question whether the supreme court intended its opinion to be
applied so broadly. 

 The issue presented in Barshop was whether the EAA Act effected a taking from
existing users by continuing to impose a then-impossible March 1, 1994 deadline to file the
declarations necessary to preserve their historic use rights. Id. at 628. To avoid the conclusion that
the filing deadline had lapsed in 1994, the State, in defense of the EAA Act's constitutionality, urged
the supreme court to construe the deadline more generally to allow existing users "six months after
the eventual effective date of the statute" (corresponding to the six-month difference between the
EAA Act's original September 1, 1993 effective date and its March 1, 1994 filing deadline) to file
their declarations. Id. The supreme court's ultimate conclusions are stated with reference to this
argument. However, the focus of the court's analysis was on avoiding the takings problem, which
it did by construing the March 1, 1994 statutory deadline as a more general requirement that existing
users have six months to file their declarations of historical use--not on deciding when, precisely,
that six-month period begins to run.

 The foundation of the Barshop court's analysis was the principle that statutory
deadlines will be construed as merely "directory" rather than mandatory when necessary to effectuate
broader legislative intent. Id. at 629-30 (citing Chisolm v. Bewley Mills, 287 S.W.2d 943, 945 (Tex.
1956); Thomas v. Groebl, 212 S.W.2d 625, 630 (Tex. 1948); and Stephenson v. Stephenson, 22 S.W.
150, 151 (Tex. 1893)). Stephenson involved an issue of deadlines similar to the present case. On
March 28, 1892, the district court entered a judgment against a plaintiff. Stephenson, 22 S.W. at
150. The plaintiff-appellant perfected appeal in the district court. Id. At that time, the courts of civil
appeals were not yet in existence so the appeal would have been taken directly to the supreme court. 
Id. Thereafter, the legislature passed the enabling act creating the courts of civil appeals and
defining their jurisdiction and procedures. See Act to Organize the Courts of Civil Appeals §§ 1-54. (14) One of the new statutory procedural requirements set a deadline of 90 days after perfection of
the appeal for appellants to file the transcript with the appellate court clerk. Id. § 20. The enabling
act took effect on September 1, 1892, id. § 54, while the appeal was pending. The plaintiff-appellant
did not deliver the transcript to the clerk of the court of civil appeals until December 5, 1892, more
than 90 days after September 1. Stephenson, 22 S.W. at 150. The court of civil appeals overruled
the plaintiff-appellant's motion to order the clerk to file the transcript and affirmed the judgment of
the district court. Id. 

 The supreme court reversed. Id. at 151. It noted that the enabling act of the courts
of civil appeals did not explicitly address the treatment of appeals that had been perfected before the
statute's effective date. Id. at 150. Because the supreme court found that "the intention of the
legislature is not express" regarding such cases, the court felt at liberty in "resorting to the utmost
liberality of construction in order to prevent the forfeiture of a valuable right." Id. at 151. The
supreme court then reasoned that, regarding appeals already pending when the act took effect, "we
shall best conform to the intention of the legislature by following that practice which is in closest
analogy to the rule prescribed for other cases. We should therefore allow 90 days, either from the
date the act took effect [September 1], or from the time the courts of civil appeals were organized." 
Id. 

 To choose between the two alternatives, the supreme court opted for the later date. 
Key to this determination was that the enabling act did not become fully operative until the first
Monday in October, the first day of the term of the courts of civil appeals. (15) See id. Thus, "[n]o
transcript could be filed in any court of civil appeals before [that] date, because there could be no
clerk with whom to file it." Id. On this basis, the court concluded that "the better and the more
reasonable rule [is] to allow the 90 days from the latter date; that is to say, from the time at which
the statute became operative upon the case, and it became possible for appellants to have placed their
transcript upon the files of the court." Id. 

 The Barshop court returned to these principles to find the EAA Act's March 1, 1994
deadline directory rather than mandatory, and that it thus did not effect a taking. Noting that "the
Act provides for permits to be granted to existing users before any provision is made for future
users," the supreme court concluded that "the Legislature obviously intended that existing users
would have preference over future users." Id. at 629. "To implement this intent," the court
observed, "the Legislature provided existing users the opportunity to file their declarations of
historical use with the Authority after the effective date of the Act but before the allocation of water
to other potential users." Id. "A contrary conclusion," the court suggested, "would require the
fallacious reasoning that the Legislature intended the provisions favoring existing users to be subject
to an impossible condition in the event of a delay in implementing the Act." Id. Similarly, while
acknowledging that the legislature had not adjusted the March 1, 1994 deadline in its 1995
amendments to the EAA Act, the court refused to construe such inaction as manifesting what it
characterized as an intent to impose an impossible condition on existing users. Id. ("It is nonsensical
to argue that the Legislature, in taking the trouble in 1995 to amend the Act to satisfy the Voting
Rights Act concerns of the Justice Department, intended that the existing-user provision would be
subject to an impossible condition that would render the entire Act unconstitutional and void."). The
court also emphasized the presumption that statutes are constitutionally valid and should be
construed so to avoid constitutional infirmities when possible. Id. 

 Based on this analysis, the Barshop court held that "the March 1, 1994 deadline
contained in the Act was intended to provide existing users six months to file their declarations of
historical use." Id. at 630 (emphasis added). The court then equated this "legislative intent . . . as
requiring declarations of historical use to be filed six months after the Authority becomes effective,"
id. (emphasis added), consistent with the State's argument. But setting a deadline of exactly six
months following the date the EAA Act became enforceable for existing users to file their
declarations does not necessarily afford them the "six months to file their declarations of historical
use" intended by the legislature. While requiring existing users to file historical use declarations,
the EAA Act was silent concerning the procedures for filing or what the declarations must contain;
rather, the legislature contemplated that the Authority would promulgate forms detailing the
information that would be required and set any filing fees. EAA Act § 1.16(b). The Authority did
not promulgate proposed rules delineating these requirements until September 3, 1996, and these
rules did not take effect until November 21, 1996. Thus, the earliest date on which Chemical Lime
possibly could have filed its declaration of historical use was November 21--barely one month
before the Authority's filing deadline--and Chemical Lime could not have known the proposed
requirements for declarations, so as to begin to prepare its filing, until September 3. If the
legislature's intent was to afford existing users "six months to file their declarations of historical
use," Barshop, 925 S.W.2d at 630, then arguably the six-month filing period would had to have run
from the September or November date.

 Such a conclusion would be supported by Stephenson, in which the supreme court
construed the 90-day statutory deadline for filing transcripts in the new courts of civil appeals to run
from the date the court clerks were first open and capable of accepting filings, October 1, 1892,
rather than simply the date the statute took effect, September 1, 1892. Stephenson, 22 S.W. at 151. 
The supreme court emphasized that "the intention of the legislature is not express"--i.e., that judges
are largely speculating about what the legislature might have done rather than what it actually
did (16)--and that, under such circumstances, it would "resort[] to the utmost liberality of construction
in order to prevent the forfeiture of a valuable right." Id. at 151. 

 The implications of a case like the present one were not before the supreme court in
Barshop. Again, the Barshop court was addressing only whether the EAA Act effected a taking, a
conclusion it avoided by holding that the March 1, 1994 filing deadline should not be applied
literally. But in doing so, the court used broad language that, perhaps inadvertently, inextricably
fixed the beginning of the legislatively intended six-month filing period at the date the EAA Act
became enforceable. Id. at 630. We are bound to follow the supreme court's holding unless and
until it revisits Barshop to clarify its scope and application. We accordingly sustain the Authority's
first issue and hold that the Authority was acting within its authority in promulgating its rule setting
the historical use filing deadline on Monday, December 30, 1996, the first working day following
six months after the supreme court issued its Barshop opinion. 


Substantial compliance

 In its second issue, the Authority argues that the district court erred in submitting to
the jury the question of substantial compliance with the Authority's filing requirements. It urges that 
a deadline cannot be susceptible to substantial-compliance claims as a matter of law. (17) When there
is a claim that the jury charge included a mistaken application of the law, we review the jury
instructions de novo. See St. Joseph Hosp. v. Wolff, 94 S.W.3d 513, 525 (Tex. 2002). We will not
reverse unless we find that an error in the jury charge caused an improper judgment to be rendered. 
Tex. R. App. P. 44.1(a)(1); see also Roberson v. City of Austin, 157 S.W.3d 130, 138 (Tex.
App.--Austin 2005, pet. denied). 

 "Substantial compliance" regarding a deadline refers to a concept that has been
recognized by Texas courts primarily in tax protest cases. Where a party has taken steps to preserve
its right to protest tax liability but has not fully complied with preservation requirements, such as
partially paying a tax or arranging for installment payments of a tax, we have held that such actions
may nonetheless constitute "substantial compliance" satisfying preservation requirements. J. C.
Evans Constr. Co. v. Travis Cent. Appraisal Dist., 4 S.W.3d 447, 451 (Tex. App.--Austin 1999, no
pet.); see Harris County Appraisal Dist. v. Krupp Realty Ltd. P'ship, 787 S.W.2d 513, 515 (Tex.
App.--Houston [1st Dist.] 1990, no writ); Missouri Pac. R.R. Co. v. Dallas County Appraisal Dist.,
732 S.W.2d 717, 721 (Tex. App.--Dallas 1987, no writ). However, where a party has failed to take
any steps to preserve the protest prior to the deadline, Texas courts have declined to consider
whether the taxpayer substantially complied through actions taken after the deadline. Harris County
Appraisal Dist. v. Dipaola Realty Assoc., L.P., 841 S.W.2d 487, 489 (Tex. App.--Houston [1st
Dist.] 1992, writ denied); Filmstrips & Slides v. Dallas Cent. Appraisal Dist., 806 S.W.2d 289, 291
(Tex. App.--Dallas 1991, no writ). Instead, they have viewed the question of compliance with the
protest deadline as not susceptible to a substantial compliance analysis. Harris County Appraisal
Dist. v. Consolidated Capital Properties IV, 795 S.W.2d 39, 41 (Tex. App.--Amarillo 1990, writ
denied) (mandatory time requirement for paying property tax not reasonably susceptible to
substantial-compliance review). This is consistent with decisions of the United States Supreme
Court, which have held that compliance with a statutory filing deadline is generally not susceptible
to analysis for substantial compliance. See United States v. Locke, 471 U.S. 84, 100-01 (1985); 
United States v. Boyle, 469 U.S. 241, 249 (1985). In Locke, for example, the supreme court rejected
the application of substantial compliance review to a statutory deadline concerning federal mining
claims.


The notion that a filing deadline can be complied with by filing sometime after the
deadline falls due is, to say the least, a surprising notion, and it is a notion without
limiting principle. If 1-day late filings are acceptable, 10-day late filings might be
equally acceptable, and so on in a cascade of exceptions that would engulf the rule
erected by the filing deadline; yet regardless of where the cutoff line is set, some
individuals will always fall just on the other side of it. Filing deadlines, like statutes
of limitations, necessarily operate harshly and arbitrarily with respect to individuals
who fall just on the other side of them, but if the concept of a filing deadline is to
have any content, the deadline must be enforced. "Any less rigid standard would risk
encouraging a lax attitude toward filing dates." United States v. Boyle, 469 U.S.
[241, 249 (1985)]. A filing deadline cannot be complied with, substantially or
otherwise, by filing late--even by one day.



United States v. Locke, 471 U.S. 84, 100-01 (1985).

 In this case, it is undisputed that Chemical Lime did not attempt to file its historical
use declaration until after the December 30, 1996 deadline. Chemical Lime urges that we can apply
a substantial compliance analysis to its failure to meet the December 30 deadline. We find no
support in Texas law for doing so, (18) and we are persuaded by the Supreme Court's reasoning in
Locke: if failure to meet a deadline can nonetheless "substantially comply" with it, the meaning and
relevance of deadlines would inevitably be eroded. Id. Such a result counsels us that, where the
legislature or an agency acting within the scope of its delegated powers has properly established a
deadline, it is beyond our power to undermine it by applying a substantial-compliance analysis,
which appears to be purely a judge-made creation of common law. 

 Chemical Lime attempts to distinguish cases like Locke on the basis that they
involved straightforward, clearly-established deadlines, whereas here there was some uncertainty
regarding the appropriate deadline. We acknowledge the difficulty we encountered when addressing
the Authority's first issue concerning exactly when the EAA Act took effect and how the statutory
historical use declaration filing deadline should be applied. However, these difficulties do not give
rise to an exception from the principle that deadlines are not subject to substantial compliance
review. Barshop compelled us to sustain the Authority's first issue and hold that the Authority acted
within its statutory authority in setting a deadline of December 30, 1996 to file historical use
declarations. Chemical Lime does not challenge the validity of this deadline on any other basis. In
addition, the record establishes that Johnson, in attempting to complete the application, was aware
of this deadline and did not raise his substantial-compliance and related claims of deadline until
afterward. 

 Finally, Chemical Lime contends that it "substantially complied" because it inquired
with the Authority prior to the deadline and alleges it was informed by an agency staff member that
it could wait to file its declaration until it had compiled all required historical use information. 
Instances of agency "run-around," such as those alleged here, undermine the trust and confidence
of the people of the State of Texas, those whom agencies are ultimately charged with serving. As
an appellate court charged with applying governing legal principles to such evidence, however, we
can find no support for extending substantial compliance analysis here. The United States Supreme
Court in Locke characterized a similar complaint as one of equitable estoppel, not substantial
compliance. See Locke, 471 U.S. at 90 n.7. No estoppel claim was raised below, and we cannot
consider it here. See Dreyer v. Greene, 871 S.W.2d 697, 698 (Tex. 1993) (issue must first be raised
in district court to be considered on appeal). 

 We conclude that, as a matter of law, Chemical Lime's noncompliance with the
December 30, 1996 deadline in this case is not susceptible to analysis for "substantial compliance"
and that the district court could not have submitted a substantial-compliance issue to the jury. We
sustain the Authority's second issue. Because we have sustained the Authority's second issue, we
have no need to discuss its third issue, that there is no evidence to support a finding of substantial
compliance.


Attorney's fees

 The district court awarded attorney's fees under the Uniform Declaratory Judgments
Act (UDJA) because Chemical Lime was the prevailing party and because it found that such award
was reasonable and just. See Tex. Civ. Prac. & Rem. Code Ann. § 37.009. In its fourth issue, the
Authority presents two challenges to the district court's award. First, the Authority argues that
Chemical Lime could not recover attorney's fees under the UDJA because a declaratory judgment
action was not a proper vehicle for bringing its claims. Instead, it contends that the water code
provides the sole remedy and that the water code does not support an award of attorney's fees to
Chemical Lime. Second, the Authority urges that, as the prevailing party, an award of attorney's fees
to it is now mandatory under the water code. See Tex. Water Code Ann. § 36.066(g). 

 Attorney's fees are recoverable only when provided for by statute or by the parties'
agreement. Dallas Cent. Appraisal Dist. v. Seven Inv. Co., 835 S.W.2d 75, 77 (Tex. 1992). In this
case, the dispute centers on which statutory provision, the UDJA or water code section 36.066
controls. Statutory construction matters present questions of law that we review de novo. Bragg v.
Edwards Aquifer Auth., 71 S.W.3d 729, 734 (Tex. 2002). In construing a statute, our objective is
to determine and give effect to the legislature's intent. Texas Dep't of Protective & Regulatory
Servs. v. Mega Child Care, Inc., 145 S.W.3d 170, 176 (Tex. 2004); see also Tex. Gov't Code Ann.
§ 312.005 (West 2005). If the statutory text is unambiguous, we "must adopt the interpretation
supported by the statute's plain language unless that interpretation would lead to absurd results." 
Mega Child Care, Inc., 145 S.W.3d at 177. Legislative intent is derived from the entire act, not just
its isolated portions. City of San Antonio v. City of Boerne, 111 S.W.3d 22, 25 (Tex. 2003). 

 Generally, a party proceeding under the UDJA may recover its attorney's fees. Tex.
Civ. Prac. & Rem. Code Ann. § 37.009. The grant or denial of attorney's fees under the UDJA is
within the district court's discretion, and its order will not be reversed on appeal absent a clear
showing that the court abused its discretion. Oake v. Collin County, 692 S.W.2d 454, 455 (Tex.
1985); Del Valle Indep. Sch. Dist. v. Lopez, 863 S.W.2d 507, 513 (Tex. App.--Austin 1993, writ
denied). The legal principle encompassed in the term "abuse of discretion"concerns a legal error
committed by the district court in its award of attorney's fees that injured or prejudiced appellants. 
Lopez, 863 S.W.2d at 513. We review a question of legal error de novo. State v. Heal, 917 S.W.2d
6, 9 (Tex. 1996); Mayberry v. Texas Dep't of Agric., 948 S.W.2d 312, 314 (Tex. App.--Austin 1997,
pet. denied).

 It is an abuse of discretion to award attorney's fees under the UDJA when the relief
sought is no greater than relief that otherwise exists by agreement or statute. See Texas State Bd. of
Plumbing Exam'rs v. Associated Plumbing-Heating-Cooling Contractors of Tex., Inc., 31 S.W.3d
750, 753 (Tex. App.--Austin 2000, pet. dism'd by agr.); University of Tex. v. Ables, 914 S.W.2d
712, 717 (Tex. App.--Austin 1996, no writ). To establish jurisdiction under the UDJA, a party must
plead the existence of an "underlying controversy" within the scope of section 37.004 of the civil
practice and remedies code. See Kadish v. Pennington Assocs., L.P., 948 S.W.2d 301, 304 (Tex.
App.--Houston [1st Dist.] 1995, no writ). When a statute provides an avenue for attacking an
agency order, a declaratory judgment action will not lie to provide redundant remedies. Beacon
Nat'l Ins. Co. v. Montemayor, 86 S.W.3d 260, 267 (Tex. App.--Austin 2002, no pet.) (citing Young
Chevrolet, Inc. v. Texas Motor Vehicle Bd., 974 S.W.2d 906, 911 (Tex. App.--Austin 1998, pet.
denied)). "There is no basis for declaratory relief when a party is seeking in the same action a
different, enforceable remedy, and a judicial declaration would add nothing to what would be
implicit or express in a final judgment for the enforceable remedy." Universal Printing Co. v.
Premier Victorian Homes, Inc., 73 S.W.3d 283, 296 (Tex. App.--Houston [1st Dist.] 2001, pet.
denied). It is an abuse of discretion, therefore, to award attorney's fees under the UDJA when the
statute is relied upon solely as a vehicle to recover attorney's fees. Texas State Bd. of Plumbing
Exam'rs, 31 S.W.3d at 753.

 We first consider whether the challenging the Authority's rules is an action brought
under chapter 36 of the water code. The legislature specifically permitted suits against a water
district under chapter 36 of the water code; it also declared that the Authority "has all the rights,
powers, privileges, authority, function, and duties" provided by chapter 36. See Tex. Water Code
Ann. § 36.066(a); EAA Act § 1.08; Act of May 29, 1995, 74th Leg., R.S., ch. 933, § 2, secs. 39.001-.359, § 6, 1995 Tex. Gen. Laws 4673, 4679-4701; Tex. Water Code Ann. § 36.066, .251 (West 2000
& Supp. 2005); see also Tex. Water Code Ann. § 36.205(e)(1) (West Supp. 2005) (denying to
Authority the general water district authority to assess production fees as granted in section
36.205(c)). Chemical Lime argues that it is not a right, power, privilege, authority, function, or duty
of the Authority to be sued and that, therefore, section 36.066's attorney's fees provisions do not
apply. We reject that position because we conclude that the right to attorney's fees upon prevailing
in a suit against it is a right of the Authority as contemplated by the legislature. Therefore, we must
consider the language of section 36.066 in considering this issue. We consider the UDJA's
attorney's fees provisions together with the specific language of water code section 36.066, because
statutes are to be construed together, and, if possible, conflicts between them are to be harmonized. 
Tex. Gov't Code Ann. § 311.026 (West 1998). On the other hand, in the case of an irreconcilable
conflict, the specific statute controls over the more general statute as an exception to the general
provision. Id. 

 The remedies available under chapter 36 are not exclusive. See Tex. Water Code
Ann. § 36.254 (West 2000) (provisions of chapter 36 "do not affect other legal or equitable remedies
that may be available"). In particular, water code section 36.066 permits parties to sue water districts
such as the Authority. See id. § 36.066(a). However, it also specifically provides that 


If the district prevails in any suit other than a suit in which it voluntarily intervenes,
the district may seek and the court shall grant, in the same action, recovery for
attorney's fees, costs for expert witnesses, and other costs incurred by the district
before the court. The amount of the attorney's fees shall be fixed by the court.



Id. § 36.066(g). 

 In this case, the legislative intent is clear--if the Authority prevails in a suit (other
than one in which it voluntarily intervenes), an award of attorney's fees to it is mandatory should the
Authority request them. Whatever rights Chemical Lime may have had to attorney's fees under the
UDJA generally, those rights would conflict with the water code section 36.066, and, as the specific
statute, the water code's attorney's fees provisions must prevail. In light of our disposition of the
Authority's previous issues, we must sustain the Authority's fourth issue, reverse the district court's
award of attorney's fees to Chemical Lime, and render judgment awarding attorney's fees to the
Authority for $253,525.50 for the trial court proceedings and $50,000 for the appeal before this
Court, amounts to which the parties have previously stipulated. 


CONCLUSION

 Because we are bound by Barshop's holding that the EAA Act's historical use filing
deadline is "six months after the Authority becomes effective," 925 S.W.2d at 630, and because the
EAA Act became enforceable on June 28, 1996, we reverse the judgment of the district court and
render judgment that the Authority acted under its statutory authority in setting a deadline for filing
declarations of historical use of December 30, 1996. We also reverse the portion of the judgment
holding in the alternative that Chemical Lime substantially complied with the deadline, as we can
find no support for applying the substantial compliance concept to the present facts. Finally, we
must reverse the trial court's judgment granting Chemical Lime attorney's fees and render judgment
awarding attorney's fees to the Authority for $253,525.50 for the trial court proceedings and $50,000
for the appeal before this Court, amounts to which the parties stipulated. 



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Reversed and Rendered

Filed: February 10, 2006
1. The "chemical" reference in the company's name reflects the grade of lime it produces, not
its use or creation of chemicals. It makes lime by quarrying limestone, crushing it, and applying
heat, using only limestone, a heat source, and water in this process. The heat comes from a mixture
of coal and petroleum coal, augmented by natural gas.
2. Wells producing no more than 25,000 gallons per day for domestic or livestock purposes
were exempted from the caps and the permit system. EAA Act §§ 1.16(c), 1.33. 

3. We will hereafter refer to both the EAA Act and the amendments to the EAA Act
collectively as the EAA Act except where necessary to distinguish specific amendments.
4. "A declaration is an application for initial regular permit, and is to be filed with the
Authority in accordance with this chapter." 21 Tex. Reg. 11377, 11377-84 (1996) (codified at 31
Tex. Admin. Code §§ 701.12) (adopted Nov. 22, 1996). 
5. Formerly, the Texas Water Board and currently the Texas Commission on Environmental
Quality.
6. Johnson could not remember Kipp's name. Kret reported that Johnson told him her name
at the time. Kipp, an Authority employee, testified that she did not remember this conversation but
she also could not deny that it could have happened.
7. Rick Illgner, at the time acting general manager of the Authority, and Steven Walthour, a
supervisory geologist with the Authority, also testified that applicants could supplement their
applications after December 30. Walthour testified that the reason the Authority would allow
supplements to applications was that it recognized that there was a short period of time for people
to gather the necessary information. They both testified that the Authority would not consider new
applications filed after December 30. 
8. The Authority attributes its sudden reversal to its discovery, in 2000, of an error in its
"coding" of Chemical Lime's application in its database. Because of this error, the application was
not coded as having been filed after the December 30, 1996 deadline, and thus escaped notice. This
error was not discovered until 2000.
9. See Barshop v. Medina County Underground Water District, 925 S.W.2d 618, 632-33
(Tex. 1996).
10. In its briefing, the Authority contended that its choice of the December 30, 1996 deadline
is entitled to deference. It abandoned this position at oral argument, however, conceding that our
standard of review regarding this issue is de novo. 
11. The parties do not dispute that the code construction act's method of counting months
governs here. See Tex. Gov't. Code Ann. § 311.014(c) (West 2005). Under this method, if the
number of months is to be computed by counting the number of months from a specific day, the
period ends on the same numerical day in the concluding month as the day of the month from which
the computation began. Id. Also, if the last day of a period ends on a Saturday, Sunday, or legal
holiday, the period is extended to the next day that is not a Saturday, Sunday, or legal holiday. Id.
§ 311.014(b). Here, because the six-month period expired on December 28, 1996, a Saturday, the
Authority extended the deadline to the following Monday, December 30. 
12. Because there is no thirty-first day in February corresponding to August 31, the six-month
period would have ended on the last day of the month. See Tex. Govt. Code Ann. § 311.014(c)
(West 2005). 
13. The Texas Supreme Court later reversed the judgment of the court of civil appeals. See
In re Bohart, 743 F.2d 313, 317 (5th Cir. 1984); Universal Metals & Mach., Inc. v. Bohart, 539
S.W.2d 874 (Tex. 1976). In re Bohart concerned the validity of continuing garnishment after the
judgment of the court of civil appeals but before the judgment of the supreme court. 743 F.2d at
324.
14. Act approved April 13, 1892, 22d Leg., 1st C.S., ch. 15, §§ 1-54, 1892 Tex. Gen. Laws
25, 25-34, reprinted in 10 H.P.N. Gammel, The Laws of Texas 1822-1897, at 389, 389-398.
15. See Act approved April 13, 1892, 22d Leg., 1st C.S., ch. 18, § 8, 1892 Tex. Gen. Laws 45,
46, reprinted in 10 H.P.N. Gammel, The Laws of Texas 1822-1897, at 409, 410.
16. See also Barshop, 925 S.W.2d at 629 ("The Legislature obviously did not foresee the
delays that would preclude the Act from taking effect in 1993. If it had, the Legislature could have
simply stated that declarations of historical use had to be filed six months after the effective date of
the Act."). 
17. The Authority raised this complaint in the district court in a summary judgment motion
and in a directed verdict. It also urges that the district court was required to give additional
instructions in the substantial compliance issue to the effect that compliance with the Authority's
December 28, 1996 deadline was an "essential element" of that claim. 


The district court ultimately submitted the following question:


Did Chemical Lime, Ltd. substantially comply with the requirements for an
application to the Edwards Aquifer Authority for an initial regular permit?


A party substantially complies if the party complies with the essential
requirements of the statute or rule. Substantial compliance does not require
literal and exact compliance with every requirement of a statute or rule.


In determining whether Chemical Lime substantially complied with the
requirements, you may consider whether the Edwards Aquifer Authority's
ability to carry out its duties was prejudiced by the timing of Chemical Lime's
filing.


In determining whether a party substantially complied with a requirement of a
statute or rule, you may consider whether the failure to exactly comply was
intended to evade or frustrate the purpose of the statute or rule. 


The Authority objected to this question, stating, in relevant part, that the question lacked an
instruction as to the essential elements for filing a declaration under the EAA Act. It then offered
its own instruction, that the deadline for filing the declaration was December 30, 1996, and 


[y]ou are further instructed that the essential elements of the Edwards Aquifer
Authority Act and accompanying rules of the Authority for filing an application
for an Initial Regular Permit include but are not limited to the filing of a written
document with the Authority on or before December 30, 1996.


The district court overruled the Authority's objection and refused its proposed instruction. Because
we conclude as a matter of law that Chemical Lime could not invoke substantial compliance on these
facts, we need not consider whether the district court abused its discretion in overruling the
Authority's objection to the form of the submission and in refusing the instruction. 
18. In fact, Chemical Lime cites only one case from Colorado to support its argument that
substantial compliance analysis may be applied to a deadline. See In re Title, Ballot Title &
Submission Clause, 4 P.3d 485, 493 (Colo. 2000). Colorado statutes require that the Colorado office
of state planning and budgeting file a fiscal impact statement by noon on the Friday before the
meeting of the initiative title setting board, which drafts the title and ballot wording of citizen
initiatives. Id. at 490-91. The office of state planning and budgeting filed its statement at 12:05
P.M. on March 31, 2000, and corrected errors in that report at 3:15 P.M. Id. at 491. The plaintiffs
claimed that, under Colorado statutes, the initiative title setting board lacked jurisdiction to consider
the ballot initiative at its April 5 meeting; instead, it had to wait until April 19. Id. The Colorado
Supreme Court held that the deadline was not jurisdictional in light of the Colorado Constitution's
fundamental "right of initiative and referendum," id. at 492 (quoting Loonan v. Woodley, 882 P.2d
1380, 1383 (Colo. 1994)), and the problems that would arise if the "staff of a government agency
would have the power to delay progress on an initiative simply by retaining the requested fiscal
information until a few minutes after noon on the Friday before the scheduled hearing." Id. It noted
that the substantial compliance issue arose not from compliance "within the power of the proponents
themselves" but of the staff of a state agency, who could thwart the rights of Colorado citizens by
non-compliance. Id. We find that the analysis in that case has no bearing on the dispute before us
now.